**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**Northern Division, Jackson**

**COMPLAINT**   **Civ. Action No. 3:18-mc-UNA**

**Jury Trial Requested**

_____

LONIE HENRY, as Administrator of the Estate of REXDALE HENRY        )
and LONIE HENRY, personally as spouse of Rexdale Henry,             )
deceased.                                                           )
                                                                    )
                                              PLAINTIFFS**,**        )
                                                                    )
v.                                                                  )
                                                                    )
                                                                    )
NESHOBA COUNTY, MS., by and through its BOARD OF SUPERVISORS,       )
TOMMY WADDELL, Sheriff of Neshoba County, Ms., in his official      )
and individual capacities; RALPH SCIPLE, 2015 Neshoba County       )
Sheriff's Office Investigator, in his official and individual capacities; )
 JIMMY REID, as 2015 Administrator of Neshoba County Detention      )
Center "NCDC" in his official and individual capacities; TOMMY      )
HUNTER and HARVEY HICKMAN as 2015 Supervisors and                  )
Employees of NCDC, in their official and individual capacities;     )
 "2015 NCDC Detention Officers": JAMIE HUTCHINSON, EVELYN           )
MCBEATH, TERRANCE HILL, BETSY LEACH, BURTON EDWARD OBERRY,          )
ALEXANDER BROWN, JOEY CURRY, CORTEZ PEEPLES,                       )
LESA WEATHERS, and BARRY TRUHETT, Transport Officer, in their       )
official and personal capacities,                                  )
                                              DEFENDANTS.           )
_____ )

## INTRODUCTION

1. This is a civil action against Neshoba County and its Board, Officials, Supervisors

    and Detention Officers at the Neshoba County Detention Center on behalf of

    Rexdale Henry, a member of the Mississippi Band of Choctaw Indians who was

    pulled over on July 9, 2015 for allegedly going through a stop sign, arrested

based on an inability to pay the full amount of a previous court fine, wrongfully incarcerated for six days and then murdered in the jail. One inmate has been convicted and is incarcerated for forty years. This lawsuit focuses on accountability of Neshoba County, its Sheriff and its detention officers at the NCDC for what happened to Mr. Henry in the days leading up to his death, the County's complete failure to provide reasonable protection for Mr. Henry, their denial of even the most basic medical assessment and care for his existing medical crisis, that contributed, in the end to his complete inability to protect himself from multiple assaults by cellmates as well as guards prior to even meeting the man convicted of his murder. The County, by its own direct approval and tolerance of inadequate and dangerous medical and safety conditions at the Center, created the conditions that led to Mr. Henry's six days of suffering and his death.

2.  As someone who suffered from alcoholism Mr. Henry began to go through serious alcohol withdrawal by the second day, and because he was denied any kind of medical assessment or care at all for his entire time at NCDC, he developed a version of delirium tremens that for Mr. Henry and others like him, left untreated, becomes a nightmare of dangerous mental and physical symptoms that are life-threatening.

3.  Although the symptoms can quickly turn serious, the national standards on the care and treatment of these types of individuals in jails and detention centers has indicated that the serious threat can be managed by careful medications and

monitoring.  Neshoba County completely failed to provide training or a system that would administer the necessary care to many of the detainees like Mr. Henry.  Neshoba County failed completely to operate a humane, medically approved system for handling those with alcohol withdrawal symptoms.

4. As a result, because Mr. Henry did not receive any medical assessment, and was denied any access to medical help at all, he developed the more severe form and dangerous form of the condition:  He became increasingly agitated, pounded on doors to get help, wandered in confusion alternating with anxiety attacks, and began suffering visual hallucinations, that is, trying to pick imaginary bugs or webs off the floor, trying to pick off dollar bills from other inmates' socks, walking in circles at a frantic pace around the cell, stepping over others in the holding cell who were trying to sleep, urinating on the floor and on others, overflowing the toilet, continually shaking severely, experiencing psychotic episodes and eating urine-soaked tissues. In this situation defendants at the NCDC had multiple opportunities to view the clearly recognizable symptoms he suffered, refused his pleas for some kind of medical help, and shuffled him from cell to cell, punishing him with brute force because of his repeated requests for help.

5. Plaintiff, Ms. Lonie Henry ("Ms. Henry"), as Administrator of the Estate of Rexdale Henry, and in her personal capacity as the spouse of Rexdale Henry, and also a member of the Mississippi Band of Choctaw Indians brings two different types of claims for the violations of Mr. Henry's right to medical care.  The first, is

about the shockingly inadequate conditions in the NCDC with respect to their

obligation to provide medical assessment, necessary care for pretrial detainees.

Pretrial detainees, unlike inmates, are not convicted of a crime and thus, their

rights are governed not by the Eighth Amendment right to be free from cruel and

unusual punishment but by the Fourteenth Amendment due process clause, a

slightly more protective right for pretrial detainees and their right to care.

6. Defendant Neshoba County by its Board of Trustees and the previous Sheriff

entered into a Consent Decree supervised by Federal Court Judge Tom Lee of the

U.S. District Court for the Southern District of Mississippi, to ensure that the

County rectified very similar conditions of inadequate medical assessment and

delivery of care, particularly to those with AWS, alcohol withdrawal symptoms.

Although the County complied with the efforts to improve the conditions while

under judicial supervision, in recent years the NCDC, even in a newer building,

reverted back to the same unconstitutional violations and inadequate medical

and lack of safety conditions identified by the Department of Justice previously.

7. The second claim related to a lack of medical care, also protected by the

Fourteenth Amendment due process clause, holds individual detention officers

and their supervisors, as well as the County, liable when they are aware, through

facts and circumstances of the situation, of a substantial risk of serious harm to

Mr. Henry and failure to take reasonable action to prevent the harm.  Here

Plaintiff asserts that each of these defendants were aware of a substantial risk

that Mr. Henry needed some kind of basic care, if not more, when they saw his increasingly deteriorating medical situation.

8.  The harm that they might foresee is one that a reasonable officer, who has the appropriate qualification and training for the position, would have known was potentially serious harm that could happen. Plaintiff will prove that these defendants were aware or should have been aware of the serious nature of his condition and yet disregarded the risk by completely denying him even the most basic care and assessment.  The supervisors also were directly involved in awareness of what was happening and yet showed deliberate indifference to the situation.  Neshoba County is liable because it is responsible for the actions of its officials and supervisors in the circumstances alleged in this Complaint.

9.  Mr. Henry didn't just die of the failure to provide constitutionally required medical care, a Neshoba County criminal court jury convicted another detainee of 2nd degree murder of Mr. Henry on the last day, the sixth day, of his confinement, in the last hour of his life.  Plaintiff asserts that, as a pretrial detainee, Mr. Henry's Fourteenth Amendment right to due process included an important right to reasonable protection by the detention officers and officials who had control over his safety.

10.  As such defendants are liable when they knew, were aware of a risk, or in some cases courts have argued, should have been aware of the substantial risk of a threat of serious harm and failed to take reasonable measures to avoid that

harm. In this case the lack of medical care increased the likelihood of a physical threat to Mr. Henry.

11.   Defendants who placed Mr. Henry alone with Mr. Schlegel knew or were aware of a substantial risk of serious harm to Mr. Henry.  Mr. Henry was deteriorating to a very serious state of almost immobility and incoherency and would be unable to defend himself from someone else.  Mr. Schlegel, on the other hand, had just emerged from three days of isolation based on his arrest for domestic violence and drug use.  Five minutes before being placed with Mr. Henry in Detox 2 for the last hour of Mr. Henry's life, Mr. Schlegel tested positive for methamphetamine. Whatever happened within that cell happened within three to five feet of at least three defendants who had stopped checking in on Mr. Henry and were indifferent to his situation.

12.   The previous day another incident occurred that implicates defendants deliberate indifference or complicity in substantial threats to Mr. Henry's safety. Plaintiffs, allege, other inmates entered Detox 1 where Mr. Henry and at least four other detainees were housed.  Upon information they were part of a "work crew" that were allowed to go into Detox 1 for ten minutes.

13.   Plaintiffs assert that their purpose was to "teach him a lesson" about his erratic behavior, his "annoying" irritating untreated symptoms that caused him to desparately pound on the door for help, hallucinate about bugs he could see, anxiously pace around a tiny cell housing four to eight others, stepping over

those sleeping on the floor who were crammed into the tiny detox cell.  The enforcement officers knew or were aware of the risk of retaliatory action by some of the inmates and yet, not only did nothing, but somehow allowed convicted inmates to enter the Detox Cell from the outside. When found by one of the defendants, Mr. Henry was standing in the toilet.

14. Plaintiffs also allege a conspiracy to cover up the extent of what really happened to Mr. Henry during those six days.  In November of 2017 Plaintiff learned, at the criminal trial of Mr. Schlegel, that defendants Waddell, Sciple, Reid and others acted in concert to edit tapes that were never produced but represented to the court and defense counsel as all of the tapes of the NCDC where Mr. Henry was housed for his entire time.  However, significant time periods are missing, and important camera angles were not produced.  Defendants informed the court that they did not download what they thought was not relevant despite their experience and knowledge of the prospect of both relevance to the criminal defense of Mr. Schlegel and the possibility of civil litigation that they knew was a possibility.

15. Plaintiffs also allege a conspiracy to violate Mr. Henry's constitutional rights based on class based animus, that is based on defendants' animus and unequal treatment of Native Americans, in this case, primarily members of the Mississippi Band of Choctaw Indians.   Mr. Henry, like many other members of the Mississippi Band of Choctaw Indians, was a target of racial profiling on numerous

occasions when he left the Choctaw lands and entered Neshoba County[1]. He and

other members of the Choctaw tribe were reluctant to travel into the city of

Philadelphia for fear of being racially profiled and arrested.[2] Once in the

Detention Center it was common for members of the tribe to be harassed,

denied medical treatment, sometimes beaten by others held in the Detention

Center or by employees based on their race. White inmates or white pretrial

detainees, on the other hand, were given preferential treatment regarding

access to medical and personal care, exercise, and other favorable conditions of

confinement.

16.  His medical withdrawal symptoms and his pleas for help irritated some other

inmates and pretrial detainees as well as detention officers.  Those detention

officers were aware of complaints and concerns by cellmates of Henry. A large

number of employees were aware of the growing threat to Henry of multiple

possibilities of physical attacks he could not defend against because of the lack

of treatment of his condition.

---

[1] The Neshoba County Detention system was at the center of national attention during Freedom Summer in 1964 when three civil rights activists, James Chaney, Andrew Goodman and Michael Schwerner, disappeared after being held in a previous site of the jail. Their bodies were discovered after a massive FBI investigation. Numerous Philadelphia members of the White Knights of the Ku Klux Klan of Mississippi, including Deputy Sheriff Cecil Price, were convicted of the brutal murders.

[2] Philadelphia, Mississippi and Neshoba County rely, for a significant portion of its income, on the cycle of racial profiling, arrests, court fines, failure to pay, arrests and further fines as part of its city and county budget. The statistics are similar to those reported by the U.S. Department of Justice on the cycle of profiling, arrests and inability to pay that focused on Ferguson, Missouri in previous years.

17.  On July 13 three different detention officers reacted to Mr. Henry's repeated pleas for help by shoving or pushing him as punishment for irritating them and asking for help.  The Fourteenth Amendment prohibits using punishment for pretrial detainees and certainly not for requests for medical care or access to a court when a date has been scheduled. Defendants failed to protect Mr. Henry's safety when they knew or should have known of an unreasonable risk that serious harm or injury was threatened.  Defendants maintained customs that failed to protect inmates and detainees from attacks by others incarcerated as well as by employees at NCDC.  In some times the Fourteenth Amendment right to medical care and the right to be given reasonable protection as a pretrial detainee merge; the failure to provide adequate and humane medical conditions and the awareness of the substantial risk of what can occur meets the awareness of the risk that a person like Mr. Henry has become so vulnerable because of that failure to provide medical care creates an overlapping obligation under the Fourteenth Amendment.

## II. Parties

18. Plaintiffs incorporates paragraphs 1 through 17 by reference herein.

**PLAINTIFF**

19.  Plaintiff Lonie Henry, is the widow and Administrator of the Estate of Rexdale Henry. Ms. Henry was appointed Administrator by the order of the Chancery Court of Neshoba County in 2016. Ms. Henry is a member of the Mississippi Band of the Choctaw

Indians. She and Mr. Henry were married.  They are the parents of adult children,

Anselm, Kinsey and Patricia Henry, all of whom reside in Bogue Chitto, a part of the

Choctaw reservation lands near Philadelphia, Neshoba County, Mississippi.

20.  Rexdale Henry was fifty-three years old at the time of his death on July 14, 2015, a

lifetime member of the Mississippi Band of Choctaw Indians. He resided with his wife

and family on reservation lands in Bogue Chitto. He was a medicine man for some

members of the Choctaw community in his area and served as a coach for the 'Bok Cito'

youth stick ball teams. He also played on the adult male stick ball team. The week

before his death he was a candidate for tribal council.

## DEFENDANTS

21. Defendant Neshoba County is sued under 42 U.S.C. §§ §1983, 1985 and 1986.

Neshoba County is a political subdivision of the State of Mississippi and is the entity

through its Board of Supervisors, responsible for the oversight and development of

policies, customs, and practices for the operation of the Neshoba County Detention

Center (NCDC). The County is served process by effecting the same upon the President

of the Board of Supervisors, Obbie Riley, and the Chancery Clerk of Neshoba County,

Guy Nowel.  The Neshoba County Detention Center is owned and operated by the

Neshoba County in Philadelphia, Mississippi. Neshoba County is a defendant in all

Counts of the Complaint.

22.  Defendant members of the Board of Supervisors comprised, in their official

capacity, the policy making authority for Neshoba County. The Board of Supervisors

received information from Sheriff Waddell and then Administrator Reid, among others, about policy decisions necessary to be promulgated with respect to the operation of the Detention Center, provided oversight of the daily practices and customs and conditions of the Detention Center, approved manuals, procedures, training, hiring and firing, budgets, salaries, and were informed about significant events occurring at the Detention Center. They often deferred or delegated certain actions and decisions on policies or practices of the operation of the NCDC to Sheriff Waddell and Administrator Reid. As the Board of Supervisors of Neshoba County they entered into binding consent decrees to their elected successors applied to the operation and maintenance of the NCDC. They are sued in their official capacities as the entity representing Neshoba County in all Counts of the Complaint.

23.  Defendant Tommy Waddell was the Neshoba County Sheriff responsible for the supervision and operation of the Sheriff's Department and the NCDC.  He continues to be the Sheriff. He is sued in his official and personal capacities. He is sued in all Counts of the Complaint.

24. Defendant Jimmy Reid was the Administrator of NCDC during the period between July 9 and July 15, 2015. As Administrator, Defendant Reed had responsibility for the day-to-day operation of the Neshoba County Detention Center and reported to Sheriff Waddell. He is sued in his official and personal capacities.  He is sued in all Counts of the Complaint.

25. Defendant Ralph Sciple who is sued in his official and personal capacities was the

Neshoba County investigator who worked on the investigation of Mr. Henry's death.

Defendant Sciple was an experienced investigator for the county and had prior

experience investigating deaths within the NCDC, including the brutal beating death in

November 2014 of Michael DeAngelo McDougle in the NCDC facility.  Defendant Sciple

is sued in Counts VI, VII, VIII, IX and X of the Complaint.

26. Defendant Allen Collins was the Coroner for Neshoba County and the City of

Philadelphia who responded to the NCDC upon notification that Mr. Henry had stopped

breathing.  He was present at the official autopsy conducted on July 15 and meetings

with the family before and after the second private autopsy. He is sued in his official and

personal capacities in Counts VI, VII, VIII, IX and X of the Complaint.

27. Defendant Harvey Hickman was a supervisor of the NCDC during the period July 9 to

July 14 and was responsible for supervision of employees on July 9, 10, 13 and 14 in

areas affecting Mr. Henry. Defendant Hickman is sued in his individual and official

capacities.  He is sued in all Counts of the Complaint.

28.  Defendant Tommy Hunter was a supervisor or officer or employee of the Neshoba

County Detention Center and is sued in his individual and official capacities. He was on

duty and interacted with Mr. Henry on July 12, 13 and 14 although, upon information

and belief he may have interacted with him earlier. He is sued in all Counts of the

Complaint.

29.  Defendant Officer Alexander Brown is sued in his personal and official capacities. He worked for NCDC in 2015 and is one of three detention officers who deliberately used force against Mr. Henry in an unreasonable manner to punish him for his repeated requests for medical assistance. He is sued in all Counts of the Complaint.

30. Defendant Evelyn McBeath is another one of the three detention officers employed by NCDC in 2015 who deliberately used force against Mr. Henry in an unreasonable manner to punish him for his repeated requests for assistance. She is sued in her personal and official capacities. She also had frequent opportunities to observe the changes in Mr. Henry and failed to provide medical care or to provide reasonable safety measures to protect Mr. Henry from harm. She is sued in all Counts of the Complaint.

31. Defendant Transportation Officer Barry Truhett is the third officer in Count IV who deliberately used force in an unreasonable manner to punish Mr. Henry for his repeated efforts to get help.  He  is sued in his personal and official capacities.  He is sued in all Counts of the Complaint.

32.  Defendant Jamie Hutchinson is sued in his personal and official capacities. Defendant was an employee of NCDC in 2015 who had direct contact with Mr. Henry. He was a detention officer who served meals, escorted inmates and detainees back and forth within the Detention Center and checked on the holding cells during the day shift on days when he was on duty discovering his death.  He is sued in all Counts of the Complaint.

33. Defendants Betsy Leach, Joey Curry, Cortez Peeples , Terrance Hill, Burton Edward Oberry, and Lisa Weathers were detention officers at NCDC in 2015 on duty in areas

where Mr. Henry was located between July 9 and July 14 and had opportunities to observe Mr. Henry. They are sued in their official and individual capacities and are sued in Counts I, II and III, V, VI, VII, VIII, IX and X. Defendant Oberry is also sued in Count IV for failure to intervene.

**III. Jurisdiction & Venue**

34.  Plaintiff incorporates by reference the paragraphs 1-33 of this complaint.

35. Jurisdiction and venue are based on 28 U.S.C. §1331 and 28 U.S.C. §1343, 42 U.S.C.§1983, §1985, §1986, §1988 and the Due Process Clause of the Fourteenth Amendment.

36. The Neshoba County Detention Center is located in Philadelphia, Neshoba County, Mississippi. Venue is appropriate within the United States District Court for the Southern District of Mississippi, Northern Division, Jackson, Mississippi.

**IV. Factual Allegations**

37. Plaintiff incorporates by reference the paragraphs 1-47 of this Complaint.

38.  Just before Mr. Henry's arrest on July 9, 2015, Lonie Henry became aware that Mr. Henry was experiencing small amounts of blood in his urine. Prior to his arrest on July 9, 2015, Mr. Henry had not had the opportunity to make a medical inquiry about this symptom. He also suffered from alcoholism.  Other than these previous conditions, Mr. Henry appeared to be of sound body and mind and cooperative upon his arrest on July 9, 2015. He was declared dead by the county coroner on the late morning of July 14, 2015.

*Neshoba County Detention Center*.

39.  On July 9, 2015 Mr. Henry was stopped by a Philadelphia, Mississippi City police officer for allegedly going through a stop sign. His putative arrest was based on a warrant that was issued concerning his inability to pay old court fines.

40.  Mr. Henry was held in the NCDC for six days without ever being transported to appear before a judge in a court of law as scheduled.

41.  Mr. Henry, a pretrial detainee, spent a total of 78 hours in "Detox 1", as the NCDC termed one of its jail cells, but sometimes referred to it as the "holding cell" for men. Mr. Henry spent his first 47 hours and then later another 31 hours in Detox 1. In between those two stints in Detox 1 he was transferred to three other cells for another 24 hours. Mr. Henry was transferred to his final cell Detox 2 on July 13 at 4:40 p.m. where he spent almost 17 more hours without medical care or protection before his death was discovered at 10:19 a.m. on July 14, 2015. He was unlawfully incarcerated in the NCDC for approximately 120 hours.

42.  At the time of Mr. Henry's incarceration and subsequent death, it was the policy, practice or custom to place male pretrial detainees, including Mr. Henry, into the Detox Cell 1 without proper screening. Supervisor Hickman and Defendant Joey Curry placed Mr. Henry in the Detox 1 cell without medical screening. After his arrival at NCDC, Mr. Henry was never seen by any medical staff at all, and was never given even a cursory medical evaluation.

43. Those arrested who appeared under the influence of alcohol or drugs or appeared to have special medical or psychiatric conditions were placed into the Detox 1 cell indiscriminately with those with violent tendencies, addiction or alcohol withdrawal.

44. Defendants Neshoba County and its Board of Supervisors, as well as Sheriff and Administrator Reed, had already been placed on notice that these practices, customs and policies   violated constitutional requirements and yet they allowed previous agreed upon remedies to go unenforced, reverting back to earlier unconstitutional practices, customs and policies. See Attachment "A" Notice of Findings, U.S. Department of Justice, Civil Rights Division and Consent Decree (signed by Neshoba County Board of Supervisors, and on Behalf of its successors, then Sheriff of Neshoba County on behalf of himself and his successors as well as the State Attorney General.)

45.  Judge Thomas Lee of the United States District Court for the Southern District of Mississippi , Northern Division, supervised the resulting consent decree for several years until the facility alleged it corrected its policies and customs.

46.  Upon information and belief there was no effort by Defendant Supervisors to separate pretrial detainees charged with violent and non-violent crimes. This constituted a custom that was practiced on a daily basis well before Mr. Henry arrived in the NCDC by Defendants Neshoba County and its Board of Supervisors as well as Sheriff Waddell and Administrator Reed.

47. These Government defendants had all been placed on notice that this practice of mixing inmates and pretrial detainees, violent and non-violent,  with special needs,

including alcohol withdrawal detainees, violated constitutional norms specifically identified to them. *Id.*

48.  Defendant Employees and Supervisors as well as Defendant Waddell and Administrator Reed observed Mr. Henry become progressively weaker over the six days.

*Detox 1, July 9 (10:45 a.m.) to July 11 (9:30 a.m.)*

49. After Mr. Henry was booked by Defendant Curry and Hickman, at approximately 10:45 a.m. on July 9, he was placed in the Detox 1 Cell at the Detention Center for the next 47 hours. The holding cell is located across from the booking desk. No effort for medical screening was made at any time.

50. Other than Mr. Henry's status as an alcoholic and the recent blood in his urine and stool Mr. Henry was in good mental and physical health when he arrived at the NCDC. His incarceration meant that he was unable to pursue his own medical support for the unexplained bleeding or alcohol withdrawal.

51. The Detox 1 holding cell is approximately ten by twelve feet with one sink, one toilet and a low concrete bench surrounding the walls. The bench and floor provided the only place for the men to sleep. This is a custom, practice or policy within the NCDC despite previous notice from the consent decree supervised by Judge Thomas Lee, U.S. District Court for the Southern District of Mississippi that there should be one bed for each inmate or pretrial detainee. The door of the cell has a small window where inmates can stand and view the booking area desk and staff unless the window is covered by staff. See Consent Decree and DOJ Findings, Attachment "A". Staff did on occasion,

particularly during Mr. Henry's last days in the D1 cell, cover the window. There were no beds in the cell.

52. Mr. Henry was never provided with a bed in the Detox cells. He was expected to sleep on the floor for at least the 96 hours he was incarcerated in either Detox 1 or Detox 2.

53. Upon information and belief the number of inmates in the Detox 1 holding cell with Mr. Henry ranged from 4-8 inmates with times when there were more and times when there were less during those first 47 hours. Detainees or inmates were moved into Detox 1 as aHolding cell as their bookings were completed and as detainees were transferred to the cell blocks in the back of the Detention Center.

54. The Detox 1 holding cell was intended as a temporary placement for alcoholics and addicts who might be going through some level of withdrawal or detoxification, but most arrestees were placed in that cell without distinction between violent or nonviolent charges or between withdrawal or non-withdrawal detainees. At times convicted inmates were also placed in that cell as punishment.

55. Widely accepted standards regarding the proper monitoring and treatment for withdrawals and detoxification dangers were not met for detainees like Mr. Henry, an alcoholic, and other alcoholics, going through serious withdrawal symptoms.

56. Defendants Hickman, Hutchinson, McBeath, Leach, Oberry, Peebles, Curry, and Weathers were on duty when there were minimum checks on the occupants of Detox 1

and 2. By July 10 and 11 detainees in Detox 1 started informing these defendants of problems in Detox 1 concerning Mr. Henry's condition.

57. By 9:12 a.m. on July 10 a defendant nurse from medical staff, wearing scrubs, enters booking area and then walks into the nursing station by the showers. No medical attention is provided to Mr Henry and the nurse does not look into Detox 1 where he is located. This nurse appeared on video on several occasions treating Caucasian inmates who appeared to desire some medical treatment but she never provided any medical assessment or care to Mr. Henry.

58. On July 11 at 9:05 a.m.  Mr. Henry is seen talking with a female guard at the door of Detox 1.  Upon information and belief, Mr. Henry was not allowed out of Detox 1 for any reason until July 11 at 9:18 a.m. At that time he was allowed to go to the shower room for the first time. He was given his first change of clothes, prison garb. At that time Mr. Henry, seen on the video, appears dazed and walks slowly toward the shower area. While monitoring Mr. Henry take his first shower and change of clothes, Defendant Curry became aware or was deliberately indifferent to evidence of unexplained bleeding on Mr. Henry's underwear and failed to get appropriate medical professionals to evaluate and treat Mr. Henry at that time. Mr. Henry was given a new mat at that time.

59.  Video cameras will show that after Mr. Henry exited Detox 1 to take his shower, Defendant Hutchinson kept looking in Detox 1 where occupants of D1 are talking to him. Plaintiff asserts that they are informing him of Rexdale Henry's condition.  Defendant Hutchinson points toward the shower area and Defendant Curry heads that way.

Defendant Curry is in the room with Henry for two minutes and 20 seconds before coming out and the tape ends.

60. Video evidence confirms that, according to customary practices of the NCDC, White detainees, and sometimes African American detainees booked well after Mr. Henry, were allowed to come out of Detox 1, make phone calls, engage in casual conversations with staff and be provided with showers and changes of clothes while Mr. Henry, a member of the Mississippi Band of Choctaw Indians, was left in his street clothes for 47 hours and not permitted the same privileges.

61. Upon completing his change and shower Mr. Henry was escorted to E Block by Defendant Curry to cell E-1 which he shared with one other detainee, upon information and belief, James Farmer.

62. Mr. Henry continued to show blood in his urine and video confirms that he tried, on numerous occasions, while in E Block, to inform the staff of his medical condition.

63. After moving to E Block E1 Cell July 11 and the early morning hours of July 12 Mr. Henry's symptoms of alcohol withdrawal and delirium tremens became worse.  He demonstrated increased anxiety, pacing, hallucinations, pounding on doors, confusion and insomnia, all symptoms of increased alcohol withdrawal and the beginning stages of delirium tremens. He tried to get help from Defendants Brown, Leach, Hill, Curry, Hickman, Peebles, Weathers, Oberry, Hutchinson and other unnamed employees on duty who observed these requests for help and were deliberately indifferent to Mr. Henry's requests for medical assistance.

64.  Staff, including Defendant Leach, became irritated with Mr. Henry's continued requests for medical attention and his increasingly erratic behavior (which resulted from alcohol withdrawal, and was not misconduct) and placed Mr. Henry in a locked cell without providing any kind of medical inquiry. Subsequently, on July 12 at approximately 6:16 a.m. Leach and Defendant Hunter moved Henry out of E1 to C6 in Cell C Block.  No medical help was offered. This constituted a form of punishment in violation of his status as a pretrial detainee seeking medical help.

65.  Upon information and belief at least one employee/guard admitted that he believed Mr. Henry was dying of alcohol withdrawal. Upon information and belief no action was taken by that employee, Defendant Hill.

66.  On another instance, upon information and belief, Mr. Henry crawled out of his cell and pleaded with the staff to get his traditional medicine as a Choctaw medicine man or to give him his car keys so he could go get it. Upon information and belief Defendants Leach, Hunter and Curry, among other employee and supervisor defendants, were participants or were aware that this was happening and took no action to provide even the minimal medical assessment.

67. Camera video tape from the areas of E Block and C Block related to the events concerning Mr. Henry in the above paragraph 76 is missing. The tape is missing from July 11 from 1:42p.m. until 2:43:51 p.m. That tape ends at 3:12 p.m. not 3:37 p.m. as listed on the computer disc download of the videos provided to defense counsel in the State v. Schlegel case in November 2017. There are 24 minutes missing from Camera 10 video

tape from 3:07 p.m. July 11 until 3:31:15 p.m.  At 3:58 p.m. Defendant Brown looks into

Mr Henry's cell but tape is missing from July 11 from 3:59 p.m. to 4:55 p.m. with almost

one full hour missing. Defendants Brown, Curry, Oberry, Leach, Hunter and another

female guard  are all in the area after the tape begins again until after Mr. Henry is

moved into the B Block Day Room at 7:20 p.m. At 7:25 p.m. Defendant Brown enters the

empty E1 cell and the tape ends again.

68.   Upon information and belief, any such videos would have been omitted by

Defendant Sciple, Administrator Reed or Sheriff Waddell directly or at their instruction

when they deliberately downloaded only partial security tapes concerning Mr. Henry.

69. Defendant Waddell told Rexdale Henry family members that there were

embarrassing tapes of Mr. Henry crawling, things about his urine and defecation, in an

effort to discourage them from further investigation or litigation. No such tape was

turned over in discovery when the full set of tapes was required to be turned over.

70. As county investigator, Defendant Ralph Sciple, controlled the actual downloading of

tape he and MBI investigator Harriet Richardson believed to be relevant. MBI

Investigator Richardson was new to investigations for MBI and this was the first time she

had conducted an investigation at the NCDC.  She depended on Defendants Sciple,

Waddell and Reid or their agents to identify personnel, locations and the identities of

those incarcerated near Mr. Henry at any time.

71. Defendant Sciple reported to Sheriff Waddell and Sheriff Waddell participated in

viewing the tapes and decisions of what to download Other tapes made during the time

Mr. Henry was incarcerated from July 9 to July 14 were deemed by them to be irrelevant to the investigation and thus were eventually taped over after six weeks, according to the testimony of Defendant Sciple at the criminal trial of Defendant Schlegel in November of 2017.  Downloading everything in its entirety would have been much easier than cutting and pasting segments of the video. Therefore, this crucial video evidence is unavailable to the Court, through the actions of Sciple, Sheriff Waddell, and other employees of Neshoba County.

72. Upon information and belief, certain inmates who were part of the 'working crew' on July 13 in Detox 1 were permitted by Sheriff Waddell to view portions of the tape.

73. Defense counsel for Mr. Schlegel was not notified of these decisions to provide less than the full tapes until this was disclosed at the criminal trial State v. Justin Schlegel in the first week of November 2017.   The family of Rexdale Henry learned that not all the video tapes had been produced or preserved for the first time at that trial during the testimony of Sciple and MBI Richardson.

74. Upon information and belief, the missing camera angle video tapes, the tapes of different camera locations other than those near booking, and the excised tapes at the end or beginning of downloaded tape cassettes contained videos of Mr. Henry in a distressed medical condition.

*B BLOCK Day Room: July 11 7:30 p.m. to 10:01 p.m.*

75. At 7:30 p.m. on July 11 Mr. Henry was allowed for the first time since his arrest to enter the B Block Day room or any room larger than his cell. Video evidence confirms that as the evening progressed he appeared to become more agitated and confused.

76.  Video evidence shows Mr. Henry walking up and down the hall, talking with others in B Block Day room, sometimes friendly but progressively more removed, dazed, confused and disoriented from time and place. . All of this was taping from Camera videos at the time and supposedly monitored by defendants on duty at that time.

77. Video evidence shows Mr Henry beginning to have hallucinations or psychotic episodes when he sees what appear to be many bugs on the floor that he tries to pick up. This is a classic symptom of delirium tremins.

*E BLOCK, E1 Cell: July 11 10:01 p.m. to 6:30 a.m. July 12*

78. At 10:00 p.m. video evidences Mr. Henry returned to his unlocked cell E1 from the B Block Day room. A few minutes later Mr. James Farmer, his cellmate, walked into the cell but comes right back out approaches the camera at the end of the hall and waves, pointing to E 1 where Mr. Henry was located.  No action is taken by the guard on duty. Mr. Henry and Defendant James Farmer and other detainees or inmates from the same hallway were seen at times through the night in the hallway.

79. Camera video indicates that three other inmates or detainees were located in what is believed to be E-2 and several in E-4.  E-2 was locked but became unlocked at some time in the night.  The locks are controlled by the guard at the tower. Mr. Henry's cell is

not locked at all. The two inmate/detainees are still standing waiting for their door to be unlocked.

80. Video shows James Farmer exit the cell at 10:06 pm, look around the corner at the end of hallway and confront Defendant Brown.  Farmer pointed to E1 cell where Mr. Henry is located, the others in the hallway all look in that direction but Brown fails to investigate and Farmer returns to E1. After the two other inmates enter their cell, Defendant Brown locks the door but does not go down further to investigate E1.  He returns with a flashlight and looks in to E1 and closes the door but does not lock it.

81. Video shows Defendant Brown was in hallway at 10:31 p.m. when Mr. Henry walks out of his cell, holding his side, and, once again seeks help that is denied.  Mr. Henry returns to his cell and Defendant Brown follows and enters E1 with a mop. Plaintiff alleges that Defendant Brown viewed bloody urine on the floor and mopped it.  He still failed to get any help for Mr. Henry.

82. Video cameras show Mr. Henry come out of E1 at 11:17 p.m. and talk with Defendant Coleman, however, she does not provide him any access to medical assessment or care and fails to make a report of his request. There is no system for reporting each request for medical assistance made by detainees or inmates at the NCDC. Each time Mr. Henry made a request for medical help, nothing was done, nothing was recorded and Mr. Henry was denied basic medical care that became life-threatening.

83.  Lights in the hallway were darkened such that it was impossible for the security camera to monitor what occurred during much of the night.

84.  According to a timeline developed by Defendant Sciple Mr. Henry came out of his cell five times from four seconds after midnight until 6:08 a.m. July 12. During some of that time other inmates and Defendants were also in the hallway. At 6:16 a.m. Defendants Hunter and Leach moved Mr. Henry out of E1 to C-6 in C Block. At no time did either Defendant Hunter or Leach make an attempt to get medical help for Mr. Henry despite his growing signs of serious alcohol detoxification. Neither defendant, upon information and belief, possessed the necessary training required to assess Mr. Henry.

85. Defendants Brown, Hill, Curry,  Hunter and Leach and other defendant employees were present in the hallway during the evening of July 11 and the early morning hours of July 12.

*C Block, C6 Cell and C Block Day Room*

86.  Video shows that at approximately 8:30 a.m. Mr. Henry walked out of the area of his cell and into the C Block Dayroom which was occupied by only one other detainee.

87.  Mr. Henry paced up and down the dayroom and stopped on frequent occasions to pound on the exit doors.

88.  Defendant Hutchinson who was monitoring the cell block from the tower observed what he termed a "commotion" and sent Defendant Curry to Mr. Henry's location.

89.   At approximately 9:30 a.m. on July 12 Defendants Hutchinson, Hunter and Curry decided to move Mr. Henry back to Detox 1 according to Hutchinson "to avoid him being riled up." Upon information and belief, this was approved by the supervisor on duty. No one attempted to seek medical assessment or treatment for Mr. Henry.

90.   Upon information and belief after Mr. Henry was transferred out of C Block several inmates/detainees attempted to draw attention to what was found in his cell in C6 and which, upon information and belief, was a "bloody mat."

*Detox 1 across from Booking Desk: July 12 9:30 a.m. to July 13 4:40 p.m.*

91.   When Mr. Henry was returned to Detox 1 across from the booking desk he attempted to bring his medical needs to the attention of the jailers. Video evidence confirms that every time the door to Detox 1 was opened by a defendant employee, an officer or anyone else, Mr. Henry attempted to communicate his need for help.

92.   No medical attention was given to him.

93.   Other detainees in Detox 1 observed Mr. Henry's condition. Detainees and inmates who knew Mr. Henry were aware that he was sick and not acting in his normal manner.

94. Video evidence confirms that some Detainees in Detox 1 attempted to communicate to the staff at the booking desk, including supervisors, that there was something very wrong with Mr. Henry.

95.   Detainees in Detox 1 informed staff that Mr. Henry was urinating and defecating bloody discharge.

96.  Mr. Henry began repeatedly pounding on cell doors to seek medical help as his symptoms leading toward delirium tremens increased but no help was provided. Agent supervisors and employees, including Defendant Hickman, Hutchinson, McBeath and Curry observed Mr. Henry's condition and dismissed it as "going through detox". No one followed standard procedures in the treatment of serious alcohol withdrawal symptoms and the treatment recommended and recognized by national and region standards for detention facilities.

97.  Upon information and belief none of these employees had specific training in the detoxification process or warning signs or recommended course of action. Their supervisors, Sheriff Waddell, Administrator Reid and the Board of Supervisors for Neshoba County knew or should have known about this lack of training. Upon information and belief, the detention officers only had experience with alcoholics working as guards.

98.  A growing number of NCDC guards were becoming annoyed by Mr. Henry's frequent efforts to gain their attention in order to get help or by his untreated symptoms.

99. Video evidence confirms that in an effort to punish Mr. Henry and to quiet him from appearing at the door when it was opened, in the early hours of July 13 at approximately 2:33 a.m. detention officers, Defendant Brown and O'Berry opened the door of Detox 1 and encountered Mr. Henry at the door. Defendant Brown responded to Mr. Henry's presence by immediately shoving him back into the cell and shutting the

door. Defendant Brown's push was an effort to punish Mr. Henry for appearing at the door when the door was opened in an effort to get medical assistance.

100.  Mr. Henry fell back into the cell and, upon information and belief, suffered bruises and injuries that contributed to at least one of the injuries found on the autopsy.

101.  Defendant Oberry was present beside the cell door when Mr. Henry was pushed by Defendant Brown but did not attempt to intervene to protect Mr. Henry.

102.  Defendant Brown made no attempt to check on Mr. Henry after shoving him.

103.  Upon information and belief Mr. Henry received injuries as a result of Defendant's use of force and suffered unlawful punishment as a pretrial detainee for requesting medical help.

**Defendant Evelyn McBeath:**

104.  Mr. Henry was scheduled to appear in Judge Cumberland's courtroom in the City of Philadelphia Court, Philadelphia, Mississippi on Monday morning, Monday, July 13, 2015.

105.  Video evidence confirms that when the door to Detox 1 opened at 8:56 a.m. Mr. Henry was at the door of Detox 1.  Prior to this time other detainees were brought out of D1 to prepare for court. Before Mr. Henry had an opportunity to do anything but appear at the door when it was opened Defendant McBeath placed her hands on Mr. Henry's chest and shoved him hard two times. She then shut the door of the cell without checking on his possible injuries.

106. Defendant McBeath made no attempt to listen to any effort by Mr. Henry to inquire about medical needs or his scheduled court appearance nor did she follow standard de-escalation procedures before employing excessive force. Although de-escalation procedures are the normal national, regional and local standards for first response to inmates and detainees before employing force, it was common practice at the NCDC to employ unreasonable force in responding to Native American detainees and inmates.

107.  Mr. Henry was, at no time, attempting to escape or place his hands on Defendant McBeath. He stood calmly at the door trying to talk to Defendant McBeath.

108.  Upon information and belief, Mr. Henry suffered injuries to his head, hip and back as a result of Defendant McBeath's use of force. Upon information and belief such injuries were evident on the autopsy conducted after his death.

109.  Defendant Supervisor Hickman observed Defendant McBeath go to the door of Mr. Henry's cell and immediately place two hands on his chest and shove Mr. Henry, causing him to fall back into the cell, denying Mr. Henry an opportunity to make any request at all.

110.  Video evidence confirms that Defendant Supervisor Hickman failed to intervene when he observed this action by Defendant McBeath.

111.  Other employees and defendants on duty with Defendant Hickman and Defendant McBeath also saw Defendant McBeath shove Mr. Henry twice and failed to intervene.

112.  Mr. Henry fell back, tripped on another detainee's leg and hit his hip and head on the concrete bench. Upon information and belief, Mr. Henry suffered bruises and fractures to his hip, head and ribs as a result of this fall.

113.  Detainees observed Mr. Henry's difficulty rising and his complaints of hip pain.  He also suffered unlawful punishment for requesting help for his medical condition and due process right to appear in court after then five days of confinement.

**Defendant Barry Truhett:**

114.  Upon information and belief Mr. Henry kept trying to get the attention of the defendants from the inside of the Detox 1 cell

115.  Transport Officer Barry Truhett who was standing next to the booking desk after transferring an arrestee to booking offered to silence Mr. Henry.

116.  Defendant Truhett walked over to the booking desk and picked up a taser and walked to the door of Detox 1 and opened the door.  Mr. Henry was standing by the door. Mr. Henry was not moving.

117.  Defendant Truhett attempted to use the taser but, upon information and belief, it misfired. Instead he placed his hands on Mr. Henry and pushed him back into the cell and walked in with him. Upon information and belief, Mr. Henry was injured by Defendant Truhett's actions.

118.  At no time did Defendant Truitt attempt to learn what was wrong with Mr. Henry despite de-escalation national and state training standards that should have applied to officers, supervisors and employees of the NCDC.

119.  Defendant Truitt had no authority to act under these circumstances and Defendant Supervisors failed to intervene or protect Mr.Henry.

120.   No effort was made by Supervisor Hickman, other Supervisors or defendant employees to record or forward Mr. Henry's requests for medical assistance to the on-duty nurse or other competent medical professionals.

121.  No effort was made by the assigned medical professionals to intervene or conduct initial assessments in accordance with appropriate standards. Supervisor Hickman admitted that at no time was medical care provided to Mr. Henry.

122. Defendant O'Berry, McBeath, Brown, Truhett,  Weathers, and Hunter had numerous opportunities to observe Mr. Henry's deteriorating condition on July 13, 2015 and failed to take any action even though they knew or should have known the risk of serious harm to Mr. Henry.

### The 'working crew' July 13, 2015

123.  At approximately 2:50 p.m. on July 13, 2015, Defendant Weathers opened D1 to talk with inmates.

124.  At numerous times detainees who came out of Detox 1 attempted to communicate to the staff about Mr. Henry's condition in the cell.

125. Some Inmates or Detainees complained that Mr. Henry was increasingly confused, delusional, shaking badly, complaining of pain and "talking Indian gibberish."

126.  At some time past 4 p.m., upon information and belief, members of an inmate working crew came from the outside street Tully port and entered the booking area near D1, without, upon information and belief, any search of their clothing for weapons or drugs.

127.  At approximately 4:19 p.m. Defendant Weathers placed a number of inmates into D1.

128.  Members of the working crew were in the Detox 1 cell for approximately ten minutes.

129.  Upon information and belief, several of the inmates who entered Detox 1 at the time held Mr. Henry and hit him with numerous blows to the middle of his body.  At approximately 4: 28 p.m. Defendant Hunter responded to pounding and shouting by inmates who demanded to get out of there.  Video cameras show at 4:28 p.m. Defendant Hunter opened the door  and removed several of the "working crew" inmates who returned immediately to the back of the jail.  Video evidence shows two of those who exited gave each other a 'high five'.  Several items were placed on the shelf by the booking room as these inmates headed back to their regular cells behind the booking desk.

130.  When Defendant Hunter looked in to the Detox 1 cell he found Mr. Henry standing in the toilet as it overflowed.  Upon information and belief, Mr. Henry was placed there by inmates who were in the cell at the time.

131.   Defendant Hunter removed Mr. Henry to the bathroom in the shower area and then removed him to Detox 2 cell. No effort was made by Defendant Hunter or others at the booking station to call the nurse or other medical professionals to assess what was going on with Mr. Henry or whether he had been injured. Plaintiff asserts that some of the injuries found during the autopsy after Mr. Henry's death are attributable to this beating.

132. Upon information and belief non- working crew detainees present in Detox 1 were threatened by other inmates or employees to keep quiet about what had happened. Upon information and belief these threats continue to intimidate witnesses.

*Detox 2 Cell (across from booking) July 12 4:40 p.m. to July 14 10:18 a.m.*

133.  Mr. Henry was moved to the shower area where he was given a change of clothes and placed in Detox 2, which like Detox 1, is within three to five feet from the booking desk.

134.  Bloody urine was found on the floor of Detox 1 after Mr. Henry was removed from the cell.

135.  Defendant Hunter proceeded to get a bucket and mop and cleaned up D1 cell himself stating he didn't want the trustees to come and clean inside the cell.

136.  Defendant Hunter has admitted under oath that he knew that inmates were irritated by Mr. Henry because Mr. Henry was "pissing" urine on them and they had to sleep on the floor and his (Mr. Henry's) actions were making them angry. He did not take any action prior to 4:40 p.m. to get medical help for Mr. Henry or to provide for Mr. Henry's safety.

137.   At no time did Defendant Hunter or other defendants investigate what happened in Detox 1 before Mr. Henry was transferred to Detox 2.

138.  By the early morning hours of July 14, 2015, Mr. Henry was delusional and eating urine-soaked tissue.

*Detox 2 (across from the booking desk) July 14 2:33 a.m. until 7:00 a.m.*

139.  On July 14, 2015 at approximately 3:37 a.m., Defendants Cortez Peeples and Leach observed the cell door to Detox 2 "pop open" and observed Mr. Henry walk out and head to the exit door.

140.  When Defendant Peeples confronted him, Mr. Henry stated that he was going home. He walked quietly back to Detox 2 with Officer Peeples.

141.  Defendant Peeples noticed that Mr. Henry was chewing something. Upon further investigation he determined that he was chewing urine-soaked tissue. An inspection of the D2 cell revealed wads of toilet paper soaked in urine on the floor.

142.  Defendant Peeples obtained a cleaning bucket and mop and cleaned up the urine on the floor. Neither Defendants Peeples nor Leach called any medical or psychiatric

help or assessment of Mr. Henry at that time or during his shift.  Upon information and belief there was no process followed at the Detention Center for shift change reports contrary to national, state and regional standards for facilities like the Detention Center.

143. Defendant Peeples does not remember whether he reported Mr. Henry's behavior to the incoming staff. He did not call for any medical evaluation or screening or assistance of any kind for Mr. Henry.

*Detox 2 7:00 a.m. until the Rexdale Henry's death July 14, 2015 10:19 a.m.*

144. Defendant Jamie Hutchinson was aware of Mr. Henry's condition in Cell Block C because he worked in the tower on July 12 and was the one who reported this incident and called for an officer to enter the day room.

145.  On July 14 Defendant Hutchinson worked the 7 a.m. to 3 p.m. shift. He observed Mr. Henry's behavior, his shaking and his pounding on the door but dismissed it as "going through detox." At no time did he seek medical help for Mr. Henry.

146. Defendant Hutchinson had not received any special training for handling elevated signs indicating increased confusion, delusions, psychotic episodes or danger of death during any detoxification process.  He did not possess special training to deal with evidence of bloody urine or stools. He did not possess the skills to evaluate on his own what was happening to Mr. Henry.

147. On at least nine occasions between 7: 00 a.m. and 9:18 a.m. on July 14, 2015 Defendant Hutchinson looked in the window of Detox 2 and "checked to see if his [Mr. Henry's] chest was moving up and down" to see if he was breathing. Despite his need to

check he did not call for medical assistance at any time until he believed Mr. Henry was deceased.124. Defendant Hutchinson looked in Mr. Henry's cell window at least 9 times between 7:00 a.m. and 9:18 a.m. but never called for medical help for Mr. Henry.

148.  Agent supervisors and employees, including Defendant Hickman, Hutchinson and McBeath, Sheriff Waddell and Administrator Reid observed Mr. Henry's condition and dismissed it as "going through detox" but did not abide by standard procedures for signs of dangers in the detoxification process. Upon information and belief none of these employees had specific training in the detoxification process or warning signs or recommended course of action.  Upon information and belief, their experience working as guards provided them with very little professional training about the standard procedures for the stages of alcohol withdrawal and the intense development of delirium tremens.  Although they had little training, Defendant Neshoba County and its agents provided them with enormous power to decide whether to provide life-saving treatment.

149. Video evidence confirms that Defendant Evelyn McBeath who also worked the day shift on July 14 looked in the window of Mr. Henry's Detox 2 cell multiple times and she appeared to look toward his window and engage in discussions with staff about his condition several other times. She never took any action to seek medical assistance for Mr. Henry.

150. Defendant McBeath testified in the trial of Mr. Schlegel that she observed Mr. Henry through the window of his D2 cell "trembling, shaking, laying on his back, shaking real badly" on several occasions the morning of July 14th.

151. Defendant McBeath admitted under oath that she was concerned about Mr. Henry's condition but she was only responsible for the women detainees and inmates She supposedly told  Jailer Hutchinson about her concern. He dismissed her reported concerns because he determined Mr. Henry was "just going through DTs".

*Justin Schlegel's First Placement in Detox 2 with Mr. Henry*

152. At 8:27 a.m. another detainee, Justin Schlegel, was removed from an isolation cell and placed in Detox 2 with Mr. Henry.

153.  Mr. Schlegel was arrested the morning of July 11 on alleged domestic violations and use of methamphetamine drug charges.  At the time the booking officers determined that he should be placed in isolation. He remained in isolation, away from anyone else from July 11 to July 14 when he was placed, despite Mr. Henry's vulnerable condition, in the same cell with Mr. Henry.

154.   Immediately upon entering the cell Mr. Schlegel turned back and expressed his belief that there was something wrong with the man in the cell.

155.  Video evidence confirms that Jailer Hutchinson looked in but dismissed Schlegel's concern and closed the cell door. He did not call for medical help.

156. Video evidence confirms that Justin Schlegel kept looking out the window and caught the attention of the inmate trustee, Calvin White who was cleaning the floor at the time in front of D2.

157. Video evidence confirms that Schlegel pointed back at Mr. Henry and the trustee looked in toward Mr. Henry's location.

158. Video evidence confirms that when the trustee then walked back to Jailer Hutchinson and brought him back to look into the cell.  Jailer Hutchinson still failed to take any action to address Mr. Henry's condition.

159. Video evidence confirms that at 8:56 a.m. Mr. Schlegel was taken out of D2 to meet with his probation officer and to take a drug test.

160.  Defendant Hutchinson admitted that at 9:02:07 a.m. he looked into Detox 2 again. "I can't recall why, sure he was shaking each time. I was watching his chest rise and fall when he was laying down." At 9:06 a.m. Defendant Hutchinson admits that Mr. Henry was still shaking, and again at 9:17:43 a.m. he was still shaking.

161. Video evidence confirms that in less than five minutes after receiving a positive result for methamphetamine use Mr. Schlegel was placed back in the cell with Mr. Henry instead of his, by now, cleaned cell.

162. Defendants Hickman, McBeath, Curry, and Hutchinson were deliberately indifferent to the positive test results for Mr. Schlegel and placed him with Mr. Henry

despite the increased risk of harm to Mr. Henry in what they knew was his vulnerable condition.

163. Mr. Schlegel did not want to return into the cell with Mr. Henry.

164. Video evidence confirms that when Mr. Schlegel was placed back into D2 with Mr. Henry jailers stopped looking in on Mr. Henry for the next hour.

165.  Video evidence confirms that immediately prior to that final placement in with Mr. Henry, various staff members looked in the window of D2 at Mr. Henry a total of eighteen times from 7:00 a.m. until 9:18 a.m., including Defendants Hickman, Hutchinson, McBeath and Truhett.  The staff knew that something was going on with Mr. Henry prior to Mr. Schlegel ever meeting Mr. Henry.

166.  At 9:18:37 a.m. Defendant Hutchinson opened the door to D2 to put Schlagel back in.  According to his sworn testimony Mr. Henry was still shaking, sitting up; I can't recall if I spoke to Henry."

167.  At 9:48 a.m. Defendant Hutchinson admitted at trial that "I don't recall what he was doing. I don't recall where Schlegel was."

168.  Defendant Hutchinson admitted that at 10:15 a.m. "I looked in, he was laying down. Did he go to sleep? I watched the rise and fall of his chest like I always done." Mr. Hutchinson did not seek medical help for Mr. Henry at this time or any time.

169. Defendant Hutchinson testified at the criminal trial of Justin Schlegel that "at 10:17 a.m. after I put another inmate in D1 I looked again and watched. I can't remember if I

saw his chest rise and fall except shaking to cause concern.  I did not hear any fighting, no noises." Again, Hutchinson still did not seek medical help for Mr. Henry.

170.  When asked at trial if Defendant Hutchinson had any guilt about not providing medical assessment and care to Mr. Henry he admitted that he did. "If I had seen him with these symptoms we…would have had a nurse see him."

171. Video evidence confirms that after checking again at 10:18 a.m. Defendant Hutchinson alerted Supervisor Hickman and they opened D2 to look closer at Mr. Henry. They stated that Mr. Schlegel was sleeping at the back of the cell at the time they entered the cell.

*Circumstances surrounding the discovery of Mr. Henry's death: July 14 10:18 a.m.*

172.  Video evidence confirms that upon determining that Mr. Henry had stopped breathing Defendant Hickman ordered Schlegel immediately removed from the cell and placed back in isolation. No effort at resuscitation of Mr. Henry was made by either Supervisor Hickman or Jailer Hutchinson.

173.  Although at least two other emergency rescue facilities were located within a couple of blocks of the detention center, the emergency call was made to the Pearl River EMR service located over five miles from the NCDC.

174.  The county investigator arrived seven minutes before the EMR Service from Pearl River.

175. At the time of his inspection the coroner for Neshoba County first indicated that Mr. Henry died of natural causes.

### *Individual Defendants Deliberate Indifference to the Risk of Serious Harm or Death*

176.  Defendants were deliberately indifferent to the risk of further deterioration of Mr. Henry's loss of blood and escalating signs of severe weakness such that Mr. Henry was unable to defend himself from the attacks that occurred on July 12, 13 and July 14.

177.  Video evidence confirms that despite times when a medical nurse was within three feet of Mr. Henry's cell on multiple occasions during his last days of life, defendants made no effort to provide access to this medical staff for screening, necessary treatment, or other access to medical attention.

> a)  Mr. Henry was never provided with any medical attention nor any medical screening to rule out problems of detoxification illness, unexplained bleeding, other symptoms of his pain, increasing confusion, distressed behavior, and ultimate total weakness and inability to defend himself.

> b)  Several white inmates received minor medical assistance and pain relievers while Mr. Henry was punished for asking for medical help. Defendants deliberately ignored Mr. Henry's condition while providing access to white male inmates, including visits to the nurse in the "nursing area" located 15 feet from the Detox cells and dispensing, upon information and belief, headache medications to certain favored inmates.

c)  Despite jailers and supervisors witnessing Mr. Henry's desperate efforts to get

help, the response by defendants included locking him in more restricted

environments and engaging in physical abuse to restrain him when he

attempted, on multiple occasions to inform them of his condition.

### Egregious Conduct and Defendants' Knowledge:

178. Defendants Brown, McBeath, Hickman, Curry, Leach, Hill, Hunter, Hutchinson,

OBerry, Reid, Waddell, and Weathers were on duty in areas where Mr. Henry was

located between July 9 and July 14, 2015, were all aware of Mr. Henry's changed

condition from when he entered the facility to increasing weakness, confusion,

insomnia, perseverations, substantial shaking, inability to move, delusions,

hallucinations and breathing difficulties. None of these defendants made any attempt to

report Mr. Henry's symptoms or need for medical assessment or medical attention.

179.  **Defendants Curry and Supervisor Hickman** participated in booking Mr. Henry

when he entered the NCDC around 10:45 a.m. on July 9, 2015.  Neither defendant

attempted any medical assessment or screening of Mr. Henry at that time. Both

defendants, supervisor and employee of NCDC followed customary practice that did not

provide for competent medical screening, or any medical screening, of inmates or

pretrial detainees.

180.  **Defendant Brown** had numerous opportunities to observe Mr. Henry's decreasing

medical condition.  He interacted with Mr. Henry on multiple occasions and observed

Mr. Henry's growing symptoms of alcohol detoxification on the afternoon of July 11 in E

Block and in the evening hours of July 11 and the morning hours of July 12.  Some of the

tapes of these interactions were not preserved by Defendants Sciple, Waddell or Reed.

He further interacts with Mr. Henry on July 12 in the evening and on July 13 in the early

a.m. shift when he observes Mr. Henry's efforts to get medical attention and pushes him

back into the cell. Following customary practice he never attempts to obtain medical

attention for Mr. Henry.

181. **Defendant Oberry** had opportunities to observe Mr. Henry's worsening medical

symptoms as he interacted with Mr. Henry on July 10, July 11, and July 13.  He was

aware of Mr. Henry's growing confusion, efforts to pound on doors and seek medical

help. Upon information and belief, according to customary practices Defendant OBerry

made no attempts to obtain medical help for Mr. Henry at any time and failed to

intervene when Mr. Henry was assaulted by Defendant Brown.

182. **Defendant Curry** had personal opportunities to observe Mr. Henry's decreasing

medical condition on July 10, and July 11 when he personally escorted Mr. Henry to the

shower at 9:15 a.m. and to E1 at 9:30 a.m., July 11. He also observed Mr. Henry on July

12 when he observed Mr. Henry's efforts to get medical help in C Block, made a decision

to move Henry to Detox 1 but still made no efforts to get him medical attention

according to custom and practices he merely followed.

183. **Defendant Hill** had opportunities to observe Mr. Henry's deteriorating medical

condition on July 9, July 11 and July 12. Upon information and belief, Defendant Hill

recognized that Mr. Henry needed serious medical attention.  Upon information and

belief Defendant Hill, according to customs and practices in place, took no action to obtain that medical attention for Mr. Henry.

184. **Defendant Leach** had opportunities to observe Mr. Henry's deteriorating condition on July 11, 12 and July 14.   On July 12 Leach interacted with Mr. Henry in decisions to transfer him from E Block to C Block in the early morning hours when Mr. Henry was seeking help for his medical condition and exhibiting confusion and, upon information and belief, delusions.  No attempt was made, according to the persistent customary practice of ignoring requests for medical help, by Defendant Leach to obtain medical assessment or medical care of any type for Mr. Henry.

185. **Defendant Hunter** had opportunities to observe and act upon Mr. Henry's need for medical assessment and medical care when he and Defendant Leach moved Mr. Henry from E Block E1 to C Block C6 on the morning of July 12 and then again on July 13 and 14.  Mr. Henry had engaged in numerous attempts to seek medical help which had been ignored or punished by placing Mr. Henry in locked cells or moving him from one Block to another Block.  Following customary practices of the NCDC Defendant Hunter did not ever seek medical assessment or medical care for Mr. Henry.  Mr. Hunter also had opportunities to obtain medical help for Mr. Henry when he observed what had occurred in Detox 1 from approximately 4 pm to 4: 40 p.m when he observed Mr. Henry standing in the toilet in D1 and heard the angry complaints of inmates and detainees who were taken out of D1 at that time.  Despite the obvious confusion and condition of Mr. Henry Defendant Hunter was in a unique position to obtain medical assessment or

treatment or Mr. Henry but failed to do so according to the customary practices of NCDC.

186.  **Defendant McBeath** had multiple opportunities to observe Mr. Henry's declining medical condition, his confusion, his severe shaking, his subsequent inability to move around, his pounding and efforts to seek medical help but she failed to ever obtain medical assessment or medical care for Mr. Henry according to customary practices of NCDC.  She interacted with Mr. Henry on July 13 when she responded to his requests for medical help or attempted to notify her of his impending court appearance by pushing him hard two times causing him to fall back into the cell, hit his hip and head and other unknown injuries.  She never obtained help or assessment of those or any other symptoms or injuries and, punished him for requesting help. On July 14 Defendant McBeath had multiple opportunities to observe Mr. Henry's condition before he died. She was aware that he had severe shaking and needed medical attention but referred it to her co-worker Defendant Hutchinson because he was responsible for the male inmates at the time and did nothing further to get assistance for Mr. Henry.

187.  **Defendants Peebles and Leach**: Observed serious need for medical observation, assessment and treatment for Mr. Henry but engaged in common practice of failing to record Mr. Henry's need for medical attention or his requests for medical attention or medication. Upon information and belief neither Peebles nor Leach took action to provide Mr. Henry with any medical assessment or treatment. Defendant Peebles and Defendant Betsy Leach on duty at 2:33 a.m.  July 13 were aware of Mr. Henry's mental

confusion, Mr. Henry's chewing of urine-soaked toilet paper and, upon information and belief, blood stained urine on the floor of his cell at that time. (T, Video)

188.  Neither Defendant Peeples nor Defendant Leach who were on duty at that time took any action to obtain medical assistance or initial screening to discover what was going on with Mr. Henry.

> a)  NCDC did not have a reporting standard to occur at each change of shift. Defendant Peeples recognized that there was no policy in existence requiring them to report to the change of shift about Mr. Henry's condition. (T)

> b)  These defendants exhibited deliberate indifference to the substantial risk that Mr. Henry needed medical and psychological assessment and assistance at that time and up until his death the next morning.

189.  **Defendant Hutchinson** had multiple opportunities to observe Mr. Henry's medical symptoms and worsening medical conditions:

> a)  Defendant Hutchinson was on duty and interacted with Mr. Henry on July 10, July 11 while Mr. Henry was in Detox 1 the first time and then on July 12 when he worked in the tower and observed what he has testified to as Mr. Henry's "commotion" and the decision to transfer him to Detox 1 "to keep him from being riled up."

> b) Defendant Hutchinson had further multiple chances to help Mr. Henry get medical attention on July 14 before Mr. Henry finally died.  Mr. Hutchinson

observed Mr. Henry's condition at 7:41 a.m., 8:20 a.m. 8:27 a.m. 8:47 a.m. 8:54

a.m. 8:56 a.m. 9:00 a.m. 9:02 a.m.  9:17 a.m. 9:18 a.m. 9:48 a.m. 10:15 a.m.

when he checked to determine whether he was still breathing and then at 10:18

a.m. when he and Defendant Hickman finally entered the cell and determined,

without any effort at resuscitation, that Mr. Henry was dead. Mr. Hutchinson,

along with other employees and supervisors, also failed to protect Mr. Henry by

deliberately placing him in a cell with inmates and violent detainees and failing

to supervise such placements when there was a substantial risk of injury or

death to Mr. Henry. Defendant Hutchinson, along with Defendant Supervisor

Hickman and Defendant McBeath were the officers on duty when Defendant

Schlegel was placed into the cell with Mr. Henry in the last hour of his life.

Defendant Hutchinson has admitted under oath that he checked to see if Mr.

Henry was still breathing on several occasions and even three minutes before

discovering his death.  Despite knowing that he was having trouble breathing

Defendant Hutchinson did not take any steps to provide medical assistance or

emergency aide as late as three minutes before he decided Mr. Henry had

stopped breathing.

c) Defendant Hutchinson, without proper training or guidance from his

supervisors, improperly assessed Mr. Henry's rapidly deteriorating condition as

"going through the DTs".

190. **Defendant Hickman** as Supervisor was personally aware of Mr. Henry's efforts to seek medical assistance and multiple opportunities to observe Mr. Henry

    a) Defendant Supervisor Hickman had multiple opportunities to observe Mr. Henry's request for medical attention, his deteriorating medical symptoms and condition, his growing confusion, and worsening shaking, delusions, inability to move, and difficulty breathing.

    b) Defendant Hickman personally observed Mr. Henry's condition on July 9, July 10, and July 12.  Mr. Henry appeared to get worse and came out of D1 seeking help from Hickman on July 13 and July 14.

    c)  Neither Defendant Hickman nor Defendant Hutchinson attempted to do resuscitation on Mr. Henry despite Mr. Hutchinson observing Mr. Henry breathing three minutes before they discovered he had stopped breathing.

    d) Defendant Hickman never sought help, nor did any of his employees seek medical assessment, medical treatment or other help for Mr. Henry.

    e) Defendants Hickman, McBeath, Hutchinson, and, upon information and belief, Curry and other defendant employees were present at the scene and delayed summoning the emergency medical care team. When they did finally call they chose to ignore the two closer teams and called for Perl River Emergency Rescue that was much further away from NCDC.

191.  Defendant Hickman acted with deliberate indifference to the substantial risk of serious harm to Mr. Henry by depriving him of any medical assessment or treatment, by failing to intervene when there was a real threat to Mr. Henry's safety and by actively placing Defendant Schlegel back in the cell with Mr. Henry only five minutes after Mr. Schlegel tested positive for methamphetamines. Supervisor Hickman either lacked the training himself or failed to supervise and train others by providing them with the requisite training on medical needs of those going through alcohol withdrawal.

**Defendant Sheriff Waddell and Administrator Reed**:

192.  As the officials in charge of the NCDC the Sheriff and Administrator Reid knew that conditions in the NCDC presented a substantial risk of injury to pretrial detainees, including Mr. Henry. The Sheriff and Defendant Reid consciously and unreasonably ignored that risk of substantial injury or death to Mr. Henry by his failure to insist on procedures to automatically screen each incoming detainee, provide appropriate placement depending on withdrawal status and violent tendencies, by his failure  to create a system to allow each detainee a way to request medical help and receive basic human dignities of care.  Defendant Waddell knew or was aware of the substantial risk of severe harm to the detainees or inmates based on this lack of proper medical procedures.

193.  Defendant Waddell also was or should have been aware of his obligations under the consent decree and the manuals and procedures developed following the consent decree that the NCDC was no longer following the constitutional practices, policies, or

customs agreed to in previous years and he was on notice that the jail was engaged in
unconstitutional practices, customs and policies previously identified as unconstitutional
that resulted in the death of Rexdale Henry.

194.  Medical screening procedures and mandatory assessment of a pretrial detainee
who is exhibiting signs of serious alcohol withdrawal and blood loss further the
government interests of insuring basic human needs of individuals temporarily under
the control of the government.

195. There was no legitimate governmental reason for the failure to follow agreed upon
constitutional practices, policies and customs related to required medical access,
assessment, recordkeeping, and necessary care.

196.  In addition to being the county official charged with responsibility for the oversight
of the NCDC, oversight of its administrator and employees of NCDC, Sheriff Waddell's
own conduct  violated Mr. Henry's rights by approving the decision to prevent his access
to the previously scheduled court appearance, by implementing unconstitutional
policies that caused the deliberate denial of any medical attention or treatment to Mr.
Henry, by his failure to ensure that employees were  properly trained to assess and treat
detainees going through alcohol detoxification or showing symptoms of serious medical
concern  and by failure to allow required policies of accurate reporting of medical claims
by detainees and inmates, Sheriff Waddell engaged in constitutional violations that led
to the ultimate harm and death of Mr. Henry.

197.  Defendant Waddell had a duty to report on the proper operation of the NCDC and to take steps to change any policies, customs or practices that did not comport with previously identified clearly unconstitutional practices within the NCDC.  Upon information and belief Sheriff Waddell participated in efforts to cover up the extent of the injuries received by Mr. Rexdale Henry and the failure to protect or provide medical care over the course of his six days under the control and responsibility of the Sheriff and Administrator Reed and ultimately Neshoba County and its individual members of the Board of Supervisors. Upon information and belief Defendant Waddell participated in decisions to edit video tapes that should have been preserved under his responsibilities for the investigation of any deaths in a facility under his control.

***Specific Facts Related to Count I: Violations of 42 U.S.C. §1983: Fourteenth Amendment, Due Process Clause: Conditions of Inadequate Medical Care and Failure to Protect Evidenced by Pervasive Pattern of Serious Deficiencies in Providing for Basic Human Needs Not Reasonably Related to Legitimate Governmental Objectives***

198. In 1993 the U.S. Department of Justice, Civil Rights Division notified Defendants Neshoba County, Neshoba County Board of Supervisors, Neshoba County Detention Center, their agents, as well as the then Sheriff of Neshoba County and their successors that the NCDC had serious constitutional violations regarding its failure to provide medical screening and medical care to pretrial detainees as well as to convicted inmates. (Attachment "A: DOJ Findings).

199. Defendants and their successors were further notified that mixing pretrial detainees and convicted inmates created a substantial risk of danger to the safety of the pretrial detainees. Other significant constitutional violations were identified including use of excessive force by NCDC employees against inmates and pretrial detainees. (Attachment "A" DOJ Findings)

200.  Defendants and their successors were put on notice to improve these constitutional deficiencies or face further action from the DOJ and the federal court. Defendants were placed under a federally supervised consent decree based on proceedings in the United States District Court for the Southern District of Mississippi. Judge Thomas Lee supervised oversight of jail conditions. *USA v. Neshoba County, Mississippi et al, Civil Action Number 4:94 cv 106 (September 19, 1994).(Attachment "A")*

201. The Consent Decree bound future successors of Neshoba County, Neshoba County Board of Supervisors and the Sheriff of Neshoba County and Administrators of NCDC to implement the decree indefinitely. *Id*.[3] At a minimum it put successors to the more recent Board of Supervisors and Sheriff that these practices violated the Eighth and Amendments to the U.S. Constitution.

---

[3] Supervision of the consent decree and the federal case were closed in 1997. The decision to close was based on the continued obligation to develop constitutionally mandated procedures and policies to govern the operation of the jail and to ensure the safety of all pretrial detainees and inmates. Procedures were also mandated for the indefinite future regarding provision of medical and mental health care for each inmate based on local, state and national standards.

202. Defendant Supervisors were charged with the implementation of policies and procedures to ensure the safety of pretrial detainees and inmates under their control within the Neshoba County Detention Center. (Consent Decree)

203. Defendant Supervisors were also responsible for ensuring and improving that customary practice with respect to safety of pretrial detainees and inmates complied with manuals and policies developed as a result of a mandatory court ordered consent decree supervised by Judge Thomas Lee of the United States District Court for the Southern District of Mississippi from 1994-1997. (Consent Decree)

204. Under the consent decree, Defendant County Board of Supervisors and Neshoba County as well as the former Sheriff Waddel and former County Attorney Kilpatrick agreed to establish procedures to ensure the continued safety of inmates, pretrial detainees and employees of the NCDC. The expectation was that they would continue to follow and improve these procedures, policies and customs rather than continue with constitutional violations of the inmates and detainees rights. At a minimum, they were placed on notice of the constitutional violations surrounding the identified practices.

205. After a period of time following the termination of supervision by Judge Lee, all defendants, including Neshoba County by its Board of Supervisors, Sheriff Waddell and Administrator Reed failed to comply with the continuation and implementation of policies, practices, procedures and customs that continued the mandate to keep inmates, pretrial detainees, including Mr. Henry, and employees safe or provide them

with medical care within the meaning of previously identified constitutional requirements.

206. The Defendant Board of Supervisors, Defendant Neshoba County, Defendant Waddell, Defendant Reed and Neshoba County Detention Center supervisors were responsible for providing for the training of employees of the Neshoba County detention center to employ safety practices developed as a result of previously U.S. Department of Justice identified constitutional violations.

207.  Upon information and belief Sheriff Waddell and Administrator Reid participated in policies, practices or customs, all of which directly harmed Mr. Henry.  As the officials in charge of the NCDC the Sheriff and Administrator Reid knew that conditions in the NCDC presented a substantial risk of injury to pretrial detainees, including Mr. Henry and both consciously and unreasonably ignored that risk of substantial injury or death to Mr. Henry.

208. No procedures were established to make sure supervisors and employees of NCDC were notified and trained about these continued constitutionally required practices and requirements.

209. Defendants were aware or deliberately indifferent to previous U.S. Department of Justice findings that Neshoba County Detention Center failed to do the following acts which violated the pretrial detainees Fourteenth Amendment and inmates Eighth Amendment rights to protection and to adequate and reasonable medical care:

a)   failure to follow a system to allow detainees and inmates to make prompt complaint of their need for medical assistance;

b)   failure to provide access to professional medical screening to provide information about the nature of the pretrial detainees or inmates complaint;

c)   failure to provide speedy resolution and response to the detainee about his request;

d)   failure to provide reasonable access to medical attention and immediate access in emergency situations;

e)   failure to provide specific professionally trained attention to the process of detoxification and the dangers presented: including nationally recognized standards for appropriate treatment of symptoms of severe alcohol withdrawal and delirium tremens, a life- threatening consequence of failure to treat with medications and medical attention severe signs of alcohol withdrawal;

f)    failure to segregate those special needs pretrial detainees suffering indications of withdrawal from non-withdrawal inmates and detainees for their safety.

g)   failure to train and impose efforts to immediately attempt resuscitation on someone suspected of dying and conditions for emergency protocol including calls for assistance from the closest emergency rescue source

h)   failure to train employees in all of the procedures for ensuring that
adequate medical care and protection are provided.

i)   failure to record by writing requests for medical assistance and responses
for each request; failure to record medical treatment received if and
when received.

210.  Although Defendants were aware or deliberately indifferent to the constitutional
requirements and initial efforts pursuant to the Consent Decree were successful,
defendants relapsed in their efforts to improve and follow manuals of procedures
developed while judicial supervision was operative. After the consent decree was
terminated and years prior to Mr. Henry's incarceration in 2015 the NCDC, with
Defendants knowledge or indifference, reverted to previous unconstitutional practices,
including, among others that:

a)   no system existed for medical screening prior to assigning initial
placement after the booking process;

b)   pretrial detainees, like Mr. Henry, were ignored or punished when
attempts were made to inform jailers, officers or supervisors of their
medical needs;

c)   no system was in place to record each medical request by a pretrial
detainee;

d)   medical assistance was frequently denied to members of the Mississippi
Band of Choctaw Indians, based upon their race while favored white

inmates were frequently provided with even minor medical assistance, even administration of minor pain relief not prescribed

e) no professionally trained medical personnel examined the pretrial detainees who were placed for up to 47 hours in Detox 1

f) no referrals were made to professionally trained psychological or psychiatric personnel when pretrial detainees or inmates were going through the dangerous process of detoxification or withdrawal from alcohol or drugs

g) pretrial detainees, like Mr. Henry and others, particularly Native Americans, were denied access to reasonable medical care and punished by excessive force if they repeated their requests for medical care.

h) employees were reluctant to attempt resuscitation of those incarcerated who appeared already to have died, particularly Native Americans, based on race

i) vulnerable, medically jeopardized pretrial detainees, including those suffering from alcohol and drug withdrawal were congregated together in the one Detox Cell for males with other pretrial detainees, and sometimes including convicted inmates, without consideration of their inability to defend themselves from attack.

j) NCDC did not follow a reporting standard at shift change to inform employees or supervisors of incidents related to changing medical needs or safety concerns.

k) NCDC operated a totally inadequate system of treatment of detainees and inmates suffering from the various stages of alcohol withdrawal, detoxification and the severity that is delirium tremens. The system consisted of throwing the detainees in the Detox Cell and letting them "dry out" no matter what their symptoms of withdrawal or delirium. The system is antiquated, inhumane and in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

•

211. According to national standards for Alcohol Withdrawal Syndrome:

a) All inmates and pretrial detainees should be screened for potential   AWS symptoms upon entry into the facility from the community;

b) Provision of Medical Evaluations for all detainees who screen positive, they should be referred for medical clearance and formally assessed for AWS using a standardized instrument. A trained clinician should use a validated withdrawal assessment instrument such as the Clinical Institute Withdrawal Assessment of Alcohol Scale, Revised (CIWA-Ar);

c) Detoxification: All detainees with clinically significant AWS should be treated with effective medication.

d) Symptoms and Treatment of Delirium Tremens: two of these ten symptoms: 1)nausea or vomiting, 2)tremors (severe tremor even with arms extended) 3)paroxysmal sweats, 4) anxiety (or acute anxiety), pacing all the time 5)tactile disturbances (itching, numbness, sensation of bugs crawling on and under skin),6)

auditory disturbances (hearing things not there), 7)visual disturbances (seeing

things not there), 8) severe headaches, 9)mild to severe agitation, 10) continuous

hallucinations (orientation and clouding of sensorium) Clinical Instr. Withdrawal

and Assessment of Alcohol Scale (on a continuum from 1-10).  According to the

New England Journal of Medicine in 2014 serious symptoms are evident after

three days and continue for one to eight days. Untreated Delirium Tremens can

be a life-threatening risk and requires constant monitoring, medications, possible

hospitalization and extreme intensive care measures at its most serious.[4]

212. Defendants Neshoba County, its Board of Supervisors, Sheriff Waddell and

Administrator Reed knew or were deliberately indifferent to the conditions of

confinement:

a)   Defendants Board of Supervisors of Neshoba County as the policy makers

received reports from Sheriff Waddell in Executive Session about allegations of

failure to provide adequate medical , deaths and beatings and irregular practices

at the NCDC.  The Members of the Board of Supervisors knew or were

deliberately indifferent to the persistent and widespread customs that were in

place at the NCDC.

b) Members of the Board of Supervisors, upon information and belief knew that

the standard procedure upon intake was to place detainees in Detox 1 without

---

[4] Schuckit, Marc A., "Regional and Management of Withdrawal Delirium", N.Engl. J. Med (Nov. 27, 2014)

regard to their status of withdrawal or addiction and without usual distinction in the level of crime of violence or non-violence charged during the arrest.

c) Members of the Board of Supervisors were under the responsibility to be aware of the standards, procedures and customs that they were responsible for in oversight of the operation of the NCDC.

d) Members of the Board of Supervisors knew or should have known that the NCDC was no longer following the constitutional practices, policies, or customs agreed to in previous years and that they were on notice that the jail was engaged in unconstitutional practices, customs and policies previously identified as unconstitutional that resulted in the death of Rexdale Henry.

e) Members of the Board of Supervisors knew that access to medical assessment and care at a basic level of human decency and needs was clearly established law.

f) There was no legitimate governmental reason for the failure to follow agreed upon constitutional practices, policies and customs related to required medical access, assessment, recordkeeping, and necessary care by implementing unconstitutional policies that caused the deliberate denial of any medical attention or treatment to Mr. Henry.

213. Defendant Waddell and Defendant Reed and defendant supervisors of NCDC knew the dangers of not properly training employees to assess the inmates and pretrial detainees going through some form of withdrawal.  The policy of shutting numerous

individuals in a small cell with no one trained to assess the way each individual went through detoxification was a substantial risk that serious harm would result from this failure to train.  Many of the employees did not have basic training in this area but were given the power to decide to ignore individuals by making the assessment that they were simply "going through the DTs". Anyone with even rudimentary medical training knows that "going through the D.T.s" is a potentially life threatening medical condition.

214.  Sheriff Waddell, Administrator Reed and the Board of Trustees defendants were deliberately indifferent to previous notifications by the Department of Justice of constitutional violations for just this kind of failure to train.  While he was not sheriff during the consent decree, the manuals and agreements developed pursuant to that consent decree anticipated that successors to the Sheriff (Defendant Waddell's father) would follow these constitutional norms in developing improvements to the policies.

215.  By his failure to ensure that employees were properly trained to assess and treat detainees going through alcohol detoxification or showing symptoms of serious medical concern  and by failure to allow required policies of accurate reporting of medical claims by detainees and inmates, Sheriff Waddell, Administrator Reid and Defendant Supervisors allowed customs that constituted constitutional violations that led to the ultimate harm and death of Mr. Henry.  These Defendants had a duty to report on the proper operation of the NCDC and to take steps to change any policies, customs or practices that did not comport with previously identified clearly unconstitutional practices within the NCDC.

***Factual Allegations related to §1985(3), and §1986: Conspiracies to Deprive Plaintiff's Estate and Spouse of Duty to Protect Rexdale Henry's Estate Under Color of Law***

*Cause of Death; Funeral and Decision to obtain a private autopsy*

216. The family who arrived within an hour were informed that it was probably natural causes.

217. Although an autopsy conducted by the Mississippi Medical Examiner's office the next morning revealed that Mr. Henry suffered extensive damage, massive breakage of all of his ribs, some in two separate places, a ruptured spleen and injuries on his head, arms, legs and back, the family was not informed of this by officials prior to the funeral and despite frequent requests were not provided with a copy of the first autopsy until March 2016.

218.  Defendants Waddell, Sciple, Reed, and Collins expected the body to be buried before the family learned the cause of death was not natural causes.

219. When the family became suspicious that "natural causes" did not seem to be plausible they decided to delay the burial after the funeral and arranged for the body to be transported out of state for a second, private autopsy.

220. Only then did the family learn about the true cause of death: "Blunt force trauma" from their own private pathologist.

222. When the Defendants Waddell, Sciple, and Collins, upon information and belief, learned that the burial did not take place on Sunday, July 19 they visited the funeral home to demand the location of the body and were informed that the family had already made arrangements and the body was in transport.

223. On the morning of July 20 the Defendant Collins, upon information and belief, called a  a long-time friend of the Henry family and demanded the location of the body of Rexdale Henry.

224. The coroner stated that "they were not finished" with their inquiry despite the fact that the body was intended, to his knowledge, to be buried immediately after the funeral and the body had been released for the burial.

225. Efforts were made by county officials, including Defendant Waddell and Defendant Reed and Defendant Sciple to discourage the family from obtaining a second autopsy or pursuing further inquiries.

226. The Henry family friend informed the coroner that it was too late, that the body had already been sent out of state and would be returned for burial when the second autopsy was completed.

227.  On that same day, July 20, the Chief Medical Examiner was called by the coroner or sheriff and a meeting was arranged quickly for that afternoon in Jackson at the Medical Examiner's office.

228.  A second, private autopsy was performed out of state and the body was returned the next day. The burial ceremony took place on that same week.

229. The family's designated representatives at the time were called to a meeting with the Sheriff, the MBI investigator, the Attorney General of the Mississippi Band of Choctaw Indians and unknown others. The meeting coincided with the burial of the returned body of Mr. Henry and gatherings of Choctaw at the home of the Henry family, thus preventing certain family members, including Mr. Henry's daughter from fully participating in the burial ceremonies.

230. The family was not informed about the full extent of the injuries at this time. They were not informed of Justin Schlegel as a suspect. Instead they were actively discouraged from taking any actions because of the existence of video of Mr. Henry's actions that involved what Sheriff Waddell termed very unpleasant actions involving urine and fecal material; as well as alleged video of Mr. Henry crawling on the floor, urinating and performing other actions that would be very embarrassing to his memory and to the family.

231.  No such video segments were provided to defense counsel during discovery of the trial against Justin Schlegel nor were any such videos ever shown to the family.  Instead, segments of the video tape when those actions might have occurred were missing from

the time sequence provided. Plaintiffs assert that these videos existed but were deliberately left out of the downloaded tapes.

*Arrest and prosecution of Justin Schlegel*

232. On July 27, two weeks after the death of Rexdale Henry, Justin Schlegel was arrested for the murder of Mr. Henry. Mr. Schlegel had remained in the Detention Center in isolation from July 14 until July 27 based on his original charge of violation of probation and pending charges from his July 11, 2015 arrest  when he was arrested for the murder of Mr. Henry.

233.  Several inmates signed a petition claiming that Mr. Schlegel did not kill Mr. Henry and that detention center employees and supervisors were responsible for Mr. Henry's death.

234.  A probable cause hearing was not held until March of 2016 when Mr. Schlegel received an attorney for the first time on this charge.

235. Schlegel's defense attorney never had an opportunity to review all the videos that existed when Mr. Henry was murdered. After she became Mr. Schlegel's attorney, she sought evidence obtained by the prosecution that might include exculpatory evidence for the defendant. As part of the evidence obtained she was provided with six computer discs that were represented to be the complete video captured by the Detention Center of places where Mr. Henry was incarcerated or located for the entirety of the six days he was held at the Detention Center.

*Missing Detention Center video tapes and edited tapes*

236. During the cross examination of the Mississippi Bureau of Investigation agent working on the murder of Mr. Henry and of Defendant Sciple, defense counsel and Plaintiff in this lawsuit learned for the first time that the MBI agent and the county investigator made subjective determinations about what video and what angles were relevant to the murder of Rexdale Henry and selected only their choices to be preserved.

237. It was the duty of the administrator and staff of the jail to ensure that all tapes be preserved when a death occurred in a facility under the state or county control.

238. Judge Collins who presided over the trial sent the attorneys to the detention center computer room to determine whether the entirety of the video tapes had been preserved.

239.  According to representations made by the prosecution upon their return from the jail location, the practice at the Detention Center involved re-taping over the videos after six weeks if the videos were not saved on computer discs for future evidence, litigation or insurance purposes. The prosecution represented to the Court that the rest of the videos and camera angles were retaped after the allotted time.

240. Judge Collins determined that there was the possibility of the existence of significant exculpatory evidence but that it was no longer available.

241. The state prosecutors represented to Judge Collins that all other videos, not selected by the county investigator and the agent from the MBI, were likely to have been taped over after six weeks from the date of the death in the normal routines of the jail.

242. No factual hearing was conducted by Judge Collins to determine whether bad faith existed in this process of selecting only parts of the videos for preservation.

243. After a four-day trial in November, 2017, in the Neshoba County Court, the jury found defendant Justin Schlegel guilty of 2nd degree murder. His appeal is pending.

244. The strong inference exists that the missing tapes cut from existing tapes and the missing camera angles would not favor the defendants in this civil litigation.

245. Evidence of bad faith exists because Defendant Sciple represented that the downloaded discs represented the entire video of Mr. Henry captured on the monitoring system when it did not.

246. Defendant Sciple, and upon information and belief, Sheriff Waddell or Administrator Reed, and others under their control, were the only ones making the decision to edit the tapes who could identify the various officers, employees, inmates, trustees and relevant locations that might be key to solving this murder investigation.

247. Ms. Heather Richardson had served only six months as an MBI agent. It was her first time in Neshoba County in an investigation. She had to rely on Investigator Sciple, Sheriff Waddell, Administrator Reid and their designees to identify locations, angles,

identities of personnel and inmates and detainees within the various locations of the NCDC.

248. Defendant Sciple, Sheriff Waddell and Administrator Reed had investigated many cases where video at the jail was important, including a beating death of Michael DeAngelo McDougle in November of 2014, just one year earlier, which involved extensive litigation.

249.  Camera angle five provided a different and closer view of Detox 1 where Rexdale Henry was located for the first 47 hours from July 9 to July 11 and again for 31 hours from July 12 at 9:30 a.m. to July 31 at 4:40 p.m. This angle provided a different, closer view of the inside of Detox 1 when the three pushes by three officers occurred at different times on July 13.[th]

250.  Upon information and belief this video of Camera 5 in its entirety was not selected by defendants to preserve upon Mr. Henry's death.

251.  Camera angles provided a different view of Mr. Henry's transfer from Detox 1 to Detox 2 on July 13th at 4:40 p.m. This was not preserved.

252.  Minutes are missing from tapes that were preserved and were significant times when events are alleged to have occurred that show Mr. Henry's symptoms of increasing need for medical care.

253. Defendant Sheriff Waddell and unknown other defendant supervisors and administrators viewed sections of the tape including some that he asserted were very

embarrassing to Mr. Henry. Those tapes he referred to are missing from the video downloaded by Defendant Sciple.

254. The Tape segment that shows Mr. Henry crawling out of his cell and asking for his medicine is missing.

255. Segments of E Block from July 11 between 9:30 a.m. and 7: 30 p.m. are missing.

256. Segments of C Block tape showing Mr. Henry's transfer from E Block to C Block on July 12 at approximately 6:30 a.m. are missing.

257. Tape is missing from the "commotion" that Officer Hutchinson observed from the tower on July 12 sometime between 6:30 a.m. to 9:30 a.m. concerning Mr. Henry and resulting in his being moved "to keep him from being riled up."

258. Tape is missing around midnight on several nights.

259. Defendant Sciple admitted under oath that he stopped watching tape after 7:30 a.m. or p.m. on July 11.

260. A segment of the camera 10 video on the night of July 11 morning of July 12 is blackend out. Tapes are identified as ending at one particular time slot but the next tape produced starts between 15 and 30 minutes later.

261. Upon information and belief Defendants Sciple, Waddel, and Defendant Supervisors and some employee defendants, including unknown defendants 1-4 viewed segments of the video tapes before the editing.

262. Upon information and belief these tapes were edited or cut.

*Physical Injuries Suffered by Mr. Henry*

263.  Mr. Henry suffered from the effects of a complete failure of treatment for his alcohol withdrawal that became increasingly more severe and included severe anxiety, confusion, insomnia, frenetic pacing, tremors that progressed from mild hand shaking to severe and constant shaking all over his body, delusions, hallucinations, panic attacks, untreated loss of blood that made him even more susceptible to the more severe type of alcohol withdrawal, visual, auditory and memory distortions, disorientation to time and space, perseverations, obsessive picking of imaginary and real items, and prolonged suffering;

264  In addition, he suffered pain from each blow administered by defendants and the inmates defendants placed with him as well as physical manifestations of those attacks as a result of the autopsy demonstrating multiple, seriatic attacks on his body,

265.  The official autopsy, released to plaintiff, Ms. Lonie Henry, on March 2, 2017 and allegedly completed by Dr. LeVaughn March 7, 2016 revealed that Mr. Henry suffered multiple blunt traumatic injuries, including:

  a) "multiple systemic contusions to the head, chest, back, abdomen, arms and legs."

b) "This resulted in multiple rib fractures, crushed laceration of the spleen, pulmonary contusion, hemoperitoneum, retroperitoneal hematoma and severe 'third space' (soft tissue) hemorrhage."

266.  According to the Chief Medical Examiner, State of Mississippi, "these injuries caused his death. There is no evidence of natural disease that would have caused his (Henry's) death. Toxicology was non-contributory in his death. With the currently available information and autopsy and toxicology findings, the cause of death is Multiple Blunt Trauma, Beating and the manner of death is homicide." Dr. Lisa Funte reviewed and concurred with the autopsy diagnosis and opinion on March 7, 2016.


## COUNT I

### *Violations of 42 U.S.C. §1983: Fourteenth Amendment: Conditions of Inadequate Medical Care*

267. Plaintiff incorporates by reference paragraphs 1-266 herein.

268.  Mr. Henry was denied any medical assessment or treatment due to a persistent pattern of serious deficiencies in providing for basic human and medical needs, particularly with respect to the conditions concerning universal screening of all incoming detainees for Alcohol Withdrawal Symptoms (AWS), proper medical assessment and standard treatment to avoid Delirium Tremens, a life-threatening condition as described previously.

269.  As a result of the substandard conditions, procedures and customs imposed by Defendants all alcohol withdrawal detainees were placed at substantial risk of harm and death.

270. A right to basic medical care is clearly established law and no reasonable officer or official in defendants' positions could believe that it was lawful to deny absolutely all medical assessment and care under these conditions.

271. Defendants maintained customs and practices that violated the Fourteenth Amendment's requirements to provide adequate medical screening and care to pretrial detainees as well as inmates at the Neshoba County Detention Center.

272. These customs and practices were contrary to previously developed policies and manuals mandated by a Consent Decree dated September 1994 and entered and signed in U.S. District Court for the Southern District of Mississippi, Northern Division, Judge Thomas Lee.

273.  Defendants were aware or deliberately indifferent to previous U.S. Department of Justice findings that Neshoba County Detention Center could not lawfully engage in customs and practices identified herein which violated the pretrial detainees Fourteenth Amendment and inmates Eighth Amendment rights to protection and to adequate and reasonable medical care.

274. These customs and practices were not reasonably related to a legitimate governmental non-punitive objective. The level of care was so inadequate that it

resulted in serious deprivation of his basic needs. Initial screening and attention to basic

medical needs are more than reasonably related to legitimate governmental objectives.

275. Defendant Neshoba County maintained a policy and/or custom and/or pattern and

practice of failing to properly train NCDC employees and officers, including but not

limited to, how to properly respond to situations, how to evaluate threat and

appropriate uses of force, how to respond to emergency medical needs of injured, how

to properly render first aide, and how to immediately summons emergency medical

care. Neshoba County maintained a policy and/or custom and/or pattern and practice of

failing to conduct fair and impartial investigations into officer misconduct, including

officers' use of force and deliberate indifference to serious medical needs.

276.   Defendant Neshoba County maintained a policy and/or custom and/or pattern

and practice of treating Native Americans differently, including excessive use of force

and deliberate indifference to serious medical needs and failure to protect from attacks

by other inmates, pretrial detainees or employees of NCDC.

277. As a result of the above-mentioned polices and customs and/or pattern and

practices, Defendant Neshoba County employees, sheriff and supervisors believed that

their inappropriate actions would not be subject to proper monitoring by supervisors,

and that misconduct would not be subject to investigation nor sanction, but would

instead be tolerated by Defendant Neshoba County.

278.   As a result of the Defendants actions and failure to act, Defendants actions

constituted an impermissible punishment by denying Mr. Henry of his 14th Amendment

rights to reasonable and humane medical care.

279. Mr. Henry, as a result of this lack of even basic medical assessment and care suffered enormous pain, his medical condition deteriorated such that he was unable to protect himself from physical attacks and, upon information and belief, increased the likelihood of dying from his attacks.

280. As a direct and proximate result of said Defendants' acts, omissions and deliberate indifference to a serious medical need, Defendant deprived Rexdale Henry of the right to life, equal protection, due process of law, and the right to receive basic and humane medical care for a serious medical need guaranteed to him by the Fourteenth Amendment of the United States Constitution.

**COUNT II**

***42 U.S.C. § 1983 Violation of Fourteenth Amendment: Right of Mr. Henry to medical assessment and attention:***

281. Plaintiff incorporates by reference paragraphs 1-280 herein.

282. Defendant Supervisors and Employees of NCDC are all state actors for purposes of 42 U.S.C. § 1983.

283. Defendants Supervisors and Employees of NCDC violated Rexdale Henry's Fourteenth Amendment right to medical care while he was held for six days as a pretrial detainee at the Neshoba County Detention ("NCDC") from July 9, 2015 until his death in NCDC on July 14, 2015.

284. Defendants exposed Mr. Henry to a substantial risk of serious harm and death when Defendant Supervisors and Employees denied any access to medical assessment or basic care when they personally observed the changes in Mr. Henry's  serious

symptoms of alcohol withdrawal that became progressively more serious over the

course of the six days.  Defendant Supervisors and Employees unreasonably ignored the

risk of that substantial harm to Mr. Henry despite this knowledge and failed to provide

even the most basic medical care to which  Mr. Henry was entitled

    a)    upon entering the NCDC,

    b)    after multiple attempts by Mr. Henry to request medical assistance,

    c)    after employees learned from other inmates and pretrial detainees of Mr. Henry's loss of blood and his obvious illness

    d)    after evidence of his deteriorating mental condition,

    e)    after observing his serious bouts of shaking, tremors and dismissing such as minor detoxification

    f)    after observing and joking about Mr. Henry's efforts to get help,

    g)    after observing his extreme symptoms of alcohol withdrawal, including many of the symptoms of delirium tremens, a life threatening danger if medication is not provided

    h)    after observing his breathing to determine if he was still living,

    i)    after moving him from cell to cell without help,

    j)    after observing his total inability to get up or defend himself against the danger of attack.

    k)    after failing to provide him with proper medical assistance thus rendering him too weak and vulnerable to defend himself from the risk that cellmates in Detox 1 and other locations were growing increasingly

angered by Mr. Henry's symptoms. Defendant Supervisors and
Employees were aware and disregarded that risk leading to Mr. Henry's
suffering and eventual death.

285. Mr. Henry's symptoms were sufficiently serious that a reasonable person would
conclude that he needed to be medically assessed under these circumstances and
provided with reasonable care. However, Defendant Supervisors and Government
Defendants failed to act when they themselves learned of Mr. Henry's symptoms and
allowed delegation of decision making about needed medical assessment to untrained
employees who made those decisions on their own or with the acquiescence of their
supervisor.

286.  Supervisor Hickman's own conduct evidenced the denial of basic medical
assessment and care for Mr. Henry as well as participation in decisions to place
Mr.Henry in high risk situations despite his condition of vulnerability. Neshoba County is
liable for the actions of its supervisor employees.

287. Defendants' failure to provide professional medical assessment and treatment for
Mr. Henry directly or proximately contributed to his death. On numerous occasions,
instead of providing medical assistance for Mr. Henry they ignored his condition thus
making him increasingly weaker and unable to defend himself from inmate or employee
attacks.

288. Defendants failed to place Mr. Henry in a safe place where he could receive
appropriate medical attention. This failure contributed to Mr. Henry's death.

289. Defendant Supervisors directly participated in decisions to deny Mr. Henry medical attention. Further each Defendant Supervisor acted with deliberate indifference or was aware of the symptoms and deterioration of Mr. Henry's medical state.

290. Defendant Supervisors and Employees conduct was egregious:

a) Defendants refusal to even listen to Mr. Henry's attempts to get medical help was egregious conduct;

b) use of unreasonable force in response to efforts to get medical help was egregious conduct;

c) failure to listen and act upon the information provided by other inmates and detainees about Mr. Henry's symptoms was egregious conduct;

d) failure to call emergency aid for Mr. Henry after 9:00 a.m. was egregious conduct

e) failure to attempt resuscitation after supposedly observing him breathing at 10:15 a.m. and then at 10:18 when defendants Hickman and Hutchinson decided Mr. Henry was dead was egregious conduct.

f) failure to call the Emergency Rescue team within two blocks and instead call the Emergency Rescue team ten to fifteen minutes away was egregious conduct.

*Supervisor Liability*

291.  Defendant Supervisors own conduct violated Mr. Henry's Fourteenth Amendment right to basic medical assessment and medical care.  They directly participated in decisions to deny Mr. Henry medical attention.

292.  Defendant Employees under the supervision of Defendant Supervisors engaged in conduct or omissions that violated Mr. Henry's Fourteenth Amendment right to medical assessment and basic care causing him to be totally vulnerable physically to defend himself from attacks that Defendants failed to prevent and acted to create As a result, Mr. Henry suffered pain, confusion, delirium, tremors, constant shaking, hallucinations, insomnia, anxiety attacks over the course of six days that increased the risk of his vulnerability to attack by others.  In their care and with their knowledge, Mr. Henry was placed in confinements where the risk of  attack by others became increasingly more likely.

293.  Defendants Sheriff Waddell, Administrator Reid and NCDC Supervisors failed to properly supervise and train the employees about the proper treatment of detainees going through withdrawal, addiction or medical loss of blood and this failure to train caused Mr. Henry's medical condition to deteriorate such that he was suffering unnecessarily, exhibited untreated symptoms that irritated inmates, detainees and detention officers and became too weak to defend himself. Further each Defendant Supervisor acted with deliberate indifference or were aware of the symptoms and deterioration of Mr. Henry's medical state, the increasingly serious risk of harm to Mr. Henry and yet failed to act.

294. Access to basic medical care is recognized as a human decency protected by the Due Process Clause of Fourteenth Amendment.  It is a clearly established right for pretrial detainees under the Fourteenth Amendment not to be denied medical care. Here Mr. Henry was given absolutely no access or assessment for the need for care.  No reasonable officer in like circumstances would consider it lawful to deny basic medical care to any inmate.

295. Defendant Neshoba County was aware of problems with employees' deliberate indifference to serious medical needs and uses of excessive force, and as employer Neshoba County failed to investigate and/or reprimand said behavior, and failed to discharge said officers or employees for their misconduct, thereby ratifying such conduct.

296. As a result of the above-mentioned customs and/or pattern and practices, Defendant Neshoba County employees, sheriff and supervisors believed that their inappropriate actions would not be subject to proper monitoring by supervisors, and that misconduct would not be subject to investigation nor sanction, but would instead be tolerated by Defendant Neshoba County.


**COUNT III**

*Violation of 42 U.S.C. §1983: Failure to Protect Mr. Henry from Substantial Risk of Injury or Death*


297. Plaintiff incorporates by reference Paragraphs 1-296 herein.

**DEFENDANT NESHOBA COUNTY:**

Unsafe Conditions:

298.  It was the policy or custom of Neshoba County by its adoption of the design, construction and practice to maintain only two cells as "holding cells" or "detox cells" at the Neshoba County Detention Center.  Almost all arrestees were initially placed in the one male or one female holding/detox cell.  No effort was made to separate out those going through some sort of withdrawal from others, or those with charges of crimes of violence from those with non-violent crimes.

299.  That policy of mixing those going through alcohol or drug addiction withdrawal with others, violent and non-violent reflects deliberate indifference to the constitutional rights of its inhabitants and deviates from national, state and regional standards related to detention facilities.

300.  Further the policy of not adequately monitoring the "Detox/Holding" cells constitutes deliberate indifference by defendants to the safety owed to a pretrial detainee based on the Fourteenth Amendment to the U.S. Constitution and was not reasonably related to a legitimate non-punitive governmental purpose.

Exposure to a substantial risk

301.  Defendant Neshoba County had notice that these practices were in violation of the Fourteenth Amendment duty to protect pretrial detainees from the substantial risk of serious harm.

302. Those customs put the plaintiff at substantial risk of suffering serious harm from other detainees or inmates;

303.  Defendants did not take reasonable measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk

involved; and by not taking such measures, the defendants customs and practices led to the plaintiff's injuries and death.

304. Plaintiffs assert that all Defendants, while acting under color of law, unlawfully failed to protect Mr. Henry from harm, resulting in the death of Mr. Henry, in violation of the Fourteenth Amendment to the U.S. Constitution.

305. Defendants knew that there was a substantial risk of danger to Mr. Henry when the staff placed Mr. Henry with inmates and detainees who were irritated by Mr. Henry's deteriorating medical and mental condition.

306. Upon information and belief Mr. Henry was attacked on several occasions by other inmates and detainees and received multiple injuries that contributed to his ultimate death.

307. Defendants knew that there was a substantial risk of danger to Mr. Henry when the staff ignored Mr. Henry's weakened medical condition and placed another detainee into his cell without supervision.

308. Defendants Brown, McBeath and Pruitt knew there was a substantial risk of injury to Mr. Henry when each of them, without following any de-escalation policy, on separate occasions shoved Mr. Henry back into the cell causing him to fall and, upon information and belief, cause serious fractures of his ribs and hips.

309. Defendant Supervisors failed to intervene and were deliberately indifferent to the substantial risk that allowing jailers to respond in this manner created a substantial risk of injury to the pretrial detainees and inmates, including Mr. Henry.

310. Defendants Hickman, Hutchinson, McBeath and Curry deliberately ignored the substantial risk that by placing Justin Schlegel in with Mr. Henry, in his weakened and untreated medical condition, after Schlegel had, five minutes before,  just tested positive for methamphetamine use was egregious conduct in violation of Mr. Henry's Fourteenth Amendment right to reasonable protection from harm.

311.  Mr. Schlegel was found guilty of 2nd Degree murder for the beating death of Mr. Henry.  Defendants are responsible for placing Mr. Henry in that extreme place of danger, a danger they knew and certainly should have known was a substantial risk of harm to Mr. Henry.

312. Defendants all failed to take reasonable measures to protect Mr. Henry from serious medical injuries, suffering and eventual death when they knew of the substantial risk they themselves had created. They are not entitled to qualified immunity from suit because plaintiff had a clearly established right to be free from violence from other inmates The defendants understood that placing plaintiff in a cell with a combative inmate, when the cell had no audio or video surveillance and only occasional monitoring, could lead to serious violence against plaintiff.

313. Defendants failure to protect Mr. Henry caused Mr. Henry's injuries, suffering and eventual death and the injuries were a reasonably forseeable consequence of Defendants' failure to protect against a substantial risk that they created.

314.  Upon information and belief there was no effort to separate those with charges of violent crimes from others arrested on minor crimes.

315.  Neshoba County maintained a policy and/or custom and/or pattern and practice of failing to conduct fair and impartial investigations into officer misconduct, including officers' use of force and deliberate indifference to serious medical needs. Defendant Neshoba County maintained a policy and/or custom and/or pattern and practice of treating Native Americans differently, including charges of use of force that was unreasonable and deliberate indifference to serious medical needs and failure to protect from attacks by other inmates, pretrial detainees or employees of NCDC.

316.  As a result of Defendants' failures to maintain customs and procedures that were reasonably related to a legitimate non-punitive governmental purpose and their deliberate indifference or reasonable assessment of the risk of serious harm from a failure to take reasonable measures to protect Mr. Henry, he was placed in a precarious and known situation of extreme risk and died.  Defendants failed to provide reasonable protection for Mr. Henry as a pretrial detainee and was a motivating force in causing the situation that produced Mr. Henry's death

317. As a result of the above-mentioned polices and customs and/or pattern and practices, Defendant Neshoba County employees, sheriff and supervisors believed that their inappropriate actions would not be subject to proper monitoring by supervisors, and that misconduct would not be subject to investigation nor sanction,  but would instead be tolerated by Defendant Neshoba County.

**COUNT IV**

*42 U.S.C. §1983 Fourth and Fourteenth Amendment Direct Use of Unreasonably Excessive Force Against a Pretrial Detainee*

318.  Plaintiff incorporates by reference paragraphs 1-317 herein.

319. Defendants McBeath, Brown, Truhett , Oberry and Hickman acted under color of state law.

230. Mr. Henry was a pretrial detainee under their care at the Neshoba County Detention Center.

321. In the early morning hours of July 13, 2015 Defendant Alexander Brown deliberately pushed Mr. Henry with unreasonable force as punishment for repeatedly trying to get medical help. As a result of that unreasonable force Mr. Henry was suffered some injuries, upon information and belief, manifested on the autopsies of Mr. Henry after his death.

322. Defendant Oberry was present and aware of Mr. Brown's use of force. A reasonable person in like circumstances would consider that use of force unreasonable in light of Mr. Henry's condition, his efforts to get medical help, no efforts by Mr. Brown to de-escalate a situation because Mr. Henry was just standing at the door when he was pushed. Defendant Oberry failed to intervene to protect Mr. Henry.

323. Defendant McBeath, at 8:56 a.m. and under color of state law, as a jailer employed by the Detention Center and Neshoba County, deliberately used force in an unreasonable manner causing injury as punishment for Mr. Henry's request for medical help and access to his regularly scheduled court appearance.

324. That double use of force was inflicted as punishment for Mr. Henry's constant efforts to seek medical help and to inform her that he was scheduled to be in court at that time. At no time did Mr. Henry act in a threatening manner. Without listening to Mr. Henry and without engaging in any effort to de-escalate any possible situation,

Defendant McBeath placed her two hands on Mr. Henry's chest and shoved him back into the cell.

325.  As a result of that force Mr. Henry fell back into the cell and injured hit his head and side hip on the cement/steel bench surrounding the cell.  Defendant McBeath made no effort to determine if Mr. Henry was injured and he was not given any medical attention at that time.

326. The autopsy of Mr. Henry showed multiple rib fractures, contusions on the head and hip.  Some of the injuries found on Mr. Henry on July 15 at his autopsy, upon information and belief, can be attributed to Defendant McBeath.

327. At 9:09 a.m. on July 13, 2015, Defendant Barry Truhett acted under color of state law by deliberately engaging in force in an unreasonable manner in order to "shut Mr. Henry up" as he told the officers at the booking desk he was willing to do.

328.  Mr. Henry was a pretrial detainee on July 13, 2015 and Defendant Truhett was not a regularly scheduled detention officer in the booking room but rather a transportation officer who had no business attempting to discipline a person in the Detox 1 cell.

329.  Defendant Truhett made absolutely no effort to communicate with Mr. Henry or bother to de-escalate the situation.  Mr. Henry was merely at the door when it opened. He did not raise his hands or create any kind of threat.

329. Upon information and belief, Defendant Truitt's assault contributed to the multiple injuries as well as infliction of punishment received by Mr. Henry, as a pretrial detainee, for seeking his right to appear before a court of law and for medical help before his death.

330.  Defendant Hickman was present on duty in the booking room when this occurred but he made no effort to intervene or confront Defendant about his unreasonable and punitive behavior.   A reasonable officer in like circumstances would move to de-scalate if necessary and intervene to protect the detainee from outside punitive actions of force

331.   Neshoba County maintained a policy and/or custom and/or pattern and practice of failing to conduct fair and impartial investigations into officer misconduct, including officers' use of force and deliberate indifference to serious medical needs. Defendant Neshoba County maintained a policy and/or custom and/or pattern and practice of treating Native Americans differently, including excessive use of force and deliberate indifference to serious medical needs and failure to protect from attacks by other inmates, pretrial detainees or employees of NCDC.

332.  As a result of these defendants' actions Mr. Henry received injuries that can be attributed to some of the multiple injuries reflected on the autopsies.

333.   As a result of the above-mentioned polices and customs and/or pattern and practices, Defendant Neshoba County employees, sheriff and supervisors believed that their inappropriate actions would not be subject to proper monitoring by supervisors, and that misconduct would not be subject to investigation nor sanction, but would instead be tolerated by Defendant Neshoba County.

**COUNT V**

***Violation of Mr. Henry's Fourth and Fourteenth Amendment Rights to be free from unlawful detainment, right to access to a court of law, and to his procedural due process and substantive due process life and liberty rights***

334. Plaintiff incorporates by reference paragraphs 1-333 herein.

335. Mr. Henry was denied his constitutional right under the Fourteenth Amendment to be free from excessive and unlawful detainment as a pretrial detainee when he was held for 127 hours without access to a court of law or opportunity for bail as the result of a failure to pay a previous court fine.  Mr. Henry was unable to pay.

336. All pretrial detainees must be presented to a court of law for their first appearance within forty-eight hours or sooner.  There was no reasonable excuse and demonstrates bad faith to keep Mr. Henry in NCDC for this extreme amount of time.

337. Defendants Hickman, Waddell, Reed, McBeath, and Curry and others were on duty July 13 around the booking desk knew or were deliberately indifferent that Mr. Henry was scheduled to appear in Court on July 13, 2015.

338. Upon information and belief Defendants were told by other inmates that Mr. Henry was supposed to appear in court that morning.

339. Defendants, upon information and belief, punished Mr. Henry by denying him his scheduled appearance in court or were deliberately indifferent to the risk of his rights to appear.

340.  As a result of these deliberate actions Mr. Henry remained in the NCDC and was subjected to lack of ability to obtain medical help on his own and to further attacks, causing his loss of liberty and contributing to the substantial risk of his eventual death.

## COUNT VI

### *42 U.S.C Section 1983 conspiracy to deprive plaintiffs of their civil rights*

341. Plaintiffs incorporate by reference paragraphs 1-340 herein.

342. All Defendants are state actors for purposes of 42 U.S.C. Section 1983.

343. Government and Law Enforcement Defendants were accountable for decisions and the maintenance of a custom and policy that failed to maintain the safety and health of the individuals incarcerated under their control.

344. The operation of a previous consent decree demonstrated clear knowledge and previous failures to maintain adequate procedures and implementation of medical attention for those under their control, including Rexdale Henry.

345. Defendants acted in concert to impose and oppose procedures that they knew were in violation of constitutional protections owed to Mr. Henry and others. Defendants violated the Fourteenth Amendment due process clause   when they participated in efforts to destroy evidence that was relevant to both criminal and civil proceedings concerning the violation of Mr. Henry's rights.  Spoilation of evidence for the purpose of denying Mr. Henry of his rights, by using their offices under color of state law is included in this cause of action

346.  Each defendant participated in unconstitutional behavior by cooperation or request, lent aid, encouragement or countenance to the wrongdoer or provided approval to agents acts done for their benefit and are liable under 42 U.S.C. Section 1983.

347.  As a result of this conspiracy or concerted action by defendants Mr. Henry was placed in jeopardy regarding his failing health, subjected to unnecessary and cruel pain

and suffering, physical and emotional distress, vulnerability to physical and

psychological abuse by others incarcerated as well as agents of defendants and,

ultimately, to death, caused by Defendants' actions.

348. As a result of the above-mentioned polices and customs and/or pattern and

practices, Defendant Neshoba County employees, sheriff and supervisors believed that

their inappropriate actions would not be subject to proper monitoring by supervisors,

and that misconduct would not be subject to investigation nor sanction, but would

instead be tolerated by Defendant Neshoba County.


**COUNT VII**

***42 U.S.C. Section 1985(3) class-based animus conspiracy***

349. Plaintiff incorporates paragraphs 1-348 as referenced herein.

350. Defendants were state actors for purposes of 42 U.S.C. Section 1985(3).

351. Defendants owed duties to protect Mr. Henry's life, well-being and safety while he

was unlawfully incarcerated in the Neshoba County Detention Center.

352. Defendants engaged in conspiracies interfering with the enforcement of all rights

granted by the U.S. Constitution including the Fourteenth Amendment rights of

detainees to be subject to safety from abusive assaults by other inmates or staff, to be

provided access to necessary medical care, to be provided with an initial appearance

before a court of law within 48 hours of arrest, as well as protection of Mr. Henry's life

while he was under defendants complete control by his incarceration.

353. Mr. Henry, as a member of the Choctaw tribe experienced different treatment,

segregation, abuse and discrimination while incarcerated in the Neshoba County

Detention Center based on his race and defendants' racial animus toward Choctaw

tribal members because of their race. That discrimination continued when defendants

Waddell, Sciple, Reid and others acted together, based on their racial animus to conceal

information about what happened to Mr. Henry during the entire six days of his

unlawful incarceration.  Tampering with evidence that should have been preserved

based on their total control of the facility and the inmates and detainees housed there,

means that they had an extra responsibility to preserve those records and tapes that

related to their legal interests.

354. Members of the Caucasian race were provided with visits to the nurse for minor

illnesses while Mr. Henry was denied such action.

355. Discrimination against Mr. Henry based on his race was intentional and resulted in

different treatment regarding safety, health and customs and procedures of the

Detention Center as applied to inmates of different races.

356. It was the duty of Defendants Neshoba County, the Board of Supervisors, Sheriff

Waddel and Administrator Reed to be aware of constitutional standards, national

standards and Mississippi standards that applied to the operation, procedures, practice

and customs of the Neshoba County Detention Center and any violations of any of the

above.

357. It was also the duty of all of the above to inform, train and ensure that personnel

hired to work at the Neshoba County Detention Center were in compliance with the

above standards.

358. Defendants were aware of the previous consent decree and the procedures and policies adopted to address previous unlawful practices within the Center.

359. Defendants were aware of the practices and customs at the Detention Center and that these practices and customs did not follow the agreed upon procedures adopted after the consent decree was approved by the U.S. federal court.

360. The prior knowledge and lack of action to address the dangers presented encouraged agents of defendants to engage in unlawful denials of Mr. Henry's constitutional rights.

361. As a result of this intentional conspiracy to permit a custom and practice based on racial animus Mr. Henry was denied medical attention, was placed in dangerous physical and life-threatening situations and eventually suffered injuries that caused his death.

362. Defendant Neshoba County maintained a policy and/or custom and/or pattern and/or practice of excessive force against Native American pretrial detainees and deliberate  indifference to their serious medical needs including, inadequately and improperly denying requests for medical attention, ignoring or accepting as custom the routine use of excessive force against Native American pretrial detainees and inmates requesting medical assistance, failing to properly hire, train, and supervise guards, jailers and officers at the NCDC and mixing medically ill pretrial detainees with other detainees and inmates with no process of segregation of dangerous individuals from Native Americans detained.

363.  As a result of the egregious infliction of suffering and ultimate loss of life by Mr. Henry caused by defendants, plaintiff should be awarded punitive damages for violation

of 42 U.S.C. Section 1985 (3) in regards to Mr. Henry's treatment, or lack thereof, during his six days of unlawful incarceration at the Neshoba County Detention Center.

## COUNT VIII

### 42 U.S.C Section 1986: Neglect to prevent constitutional violations

364. Plaintiff incorporates by reference paragraphs 1-363 herein.

365. Defendants had knowledge of the constitutional violations pursuant to the Fourteenth Amendment visited upon Mr. Henry and took no action to address or prevent those wrongs.

366. Defendants had the power to prevent or aid in the preventing these constitutional violations, instead they took actions to conceal and cover up facts that would protect the constitutional goals of these amendments.

367. Defendants, having this knowledge and this power, neglected to take any action and as a result is liable

368. As a result of this knowledge and failure to act to protect Mr. Henry's Fourteenth Amendment constitutional rights to be protected from preventable life-threatening actions, Mr. Henry suffered unspeakable pain and injuries and died within the Neshoba County Detention Center.

369. As a result plaintiff should be awarded punitive damages specifically for this claim.

## COUNT IX

### 42 U.S.C. § 1983 Violations of Fourteenth Amendment Substantive Due Process Rights by Plaintiff Lonie Henry

370. Plaintiffs hereby incorporate paragraphs 1-370 as though fully set forth herein.

371. This is an action brought against Defendant Neshoba County pursuant to 42 U.S.C.

§ 1983 and § 1988 by Plaintiffs Lonie Henry personally as the widow of Rexdale Henry.

claim.

372. Prior to July 2015, Defendant Neshoba County developed and maintained policies

or customs and/or patterns and practice exhibiting deliberate indifference to the

constitutional rights of Native American pretrial detainees held in the Neshoba County

Detention Center which caused the violation of Plaintiffs Lonie Henry's constitutional

rights under the Due Process Clause of the Fourteenth Amendment of the United States

Constitution, to be free from state actions that cause an unwarranted state interference

with Plaintiff Lonie Henry's right to a familial relationship with Decedent, Rexdale Henry.

373. Defendant Neshoba County maintained a policy and/or custom and/or pattern

and/or practice of excessive force against Native American pretrial detainees and

deliberate  indifference to their serious medical needs including, inadequately and

improperly denying requests for medical attention, ignoring or accepting as custom the

routine use of excessive force against Native American pretrial detainees and inmates

requesting medical assistance, failing to properly hire, train, and supervise guards,

jailers and officers at the NCDC and mixing medically ill pretrial detainees with other

detainees and inmates with no process of segregation of dangerous individuals from

Native Americans detained.

374. Defendant Neshoba County was aware of problems with employees' deliberate

indifference to serious medical needs and uses of excessive force, and as employer

Neshoba County failed to investigate and/or reprimand said behavior, and failed to

discharge said officers or employees for their misconduct, thereby ratifying such

conduct.

375. Defendant Neshoba County maintained a policy and/or custom and/or pattern and

practice of failing to properly train NCDC employees and officers, including but not

limited to, how to properly respond to situations, how to evaluate threat and

appropriate uses of force, how to respond to emergency medical needs of injured, how

to properly render first aide, and how to immediately summons emergency medical

care. Neshoba County maintained a policy and/or custom and/or pattern and practice of

failing to conduct fair and impartial investigations into officer misconduct, including

officers' use of force and deliberate indifference to serious medical needs. Defendant

Neshoba County maintained a policy and/or custom and/or pattern and practice of

treating Native Americans differently, including excessive use of force

and deliberate indifference to serious medical needs and failure to protect from attacks

by other inmates, pretrial detainees or employees of NCDC.

376. The above said acts of misconduct were perpetuated, tolerated and not

reprimanded by Defendant Neshoba County. Thus, Defendant Neshoba County

inadequately discouraged constitutional violations perpetrated by its law enforcement

officers and ratified and or perpetuated conduct including the use of excessive force

and deliberate indifference to serious medical needs, and other above-mentioned

improper and unconstitutional conduct.

377.  The above facts denote a deliberate indifference on the part of Defendant

Neshoba County policy makers and custom enforcers, to uphold the constitutional rights

of Native Americans, including Plaintiffs Lonie Henry. Defendant Neshoba County's

aforementioned actions and inactions directly and proximately denied Plaintiffs

substantive due process and caused the violation of Plaintiffs right to a familial

relationship with, respectively, her husband. As such, Plaintiff's constitutional rights

were violated pursuant to the Fourteenth Amendment to the U.S. Constitution.

378.   As a result of the above-mentioned polices and customs and/or pattern and

practices, Defendant Neshoba County employees, sheriff and supervisors believed that

their inappropriate actions would not be subject to proper monitoring by supervisors,

and that misconduct would not be subject to investigation nor sanction, but would

instead be tolerated by Defendant Neshoba County.

 379.   As a direct and proximate result of said Defendant Neshoba County's acts,

omissions, and deliberate indifference to Plaintiffs Lonie Henry's constitutional right to

her familial relationship with Rexdale Henry plaintiff has been deprived of the life-long

love, companionship, comfort, support, society, care and sustenance of decedent, and

will continue to be so deprived for the remainder of their natural lives. Plaintiffs loved

decedent and Plaintiffs have suffered extreme and severe mental anguish and pain and

have been injured in mind and body.

380. Plaintiff Lonie Henry has ongoing and continuous permanent damages and injuries,

and as such is entitled to recovery for the actions caused by each defendant.

**COUNT X**

**42 U.S.C. §1985(2)**

381. Plaintiff incorporates by reference paragraphs 1-381 as fully stated herein.

382. Plaintiffs assert that Defendants Sciple and Waddel and other defendants

conspired for the purpose of impeding, hindering, obstructing, or defeating, in any

manner, the due course of justice in the State of Mississippi criminal investigation,

prosecution and possible civil litigation by the family of Rexdale Henry on his behalf,

with intent to deny to any citizen the equal protection of the laws, or to injure him or his

estate for lawfully enforcing, or attempting to enforce, the right of any **person, or class**

**of persons**, to the equal protection of the laws.

383. Upon information and belief, Defendant Sciple and Defendant Waddell conspired

to cover up information relevant to what happened to Mr. Henry while he was in the

NCDC including, among other acts:

    a)   attempting to conceal Mr. Henry's deteriorating medical condition

    b)   failing to download all of the tapes related to all of the places that Mr.

           Henry was located despite a duty to preserve when a death occurs in the

           facility

    c)   deciding to cut out, block or blacken out some of the relevant videos; a

           charge of spoilation

    d)   attempting to discourage plaintiffs to pursue further investigation

    e)   failing to inform plaintiffs that Mr. Henry's death was not due to natural

           causes prior to the designated date of his scheduled burial

    f)   attempting to stop plaintiffs from sending Mr. Henry's body out of state

           for a second and private autopsy

g)   encouraging witnesses to remain silent, encouraging or allowing other

witnesses to be intimidated prior to the criminal trial and beyond

h)   engaging in other activities to impede the discovery of facts related to

everything that happened to Mr. Henry while he was detained for six

days in the NCDC before he was found dead in his cell July 14, 2015.

384. As a direct result of these action Defendants conspired together and obstructed

efforts to discover the truth about the extent of what happened to Mr. Henry during the

entire six days of his confinement at the NCDC thus obstructing plaintiffs right to pursue

justice and due process in the ordinary course of legal investigations, criminal

prosecutions and civil lawsuits on behalf of the estate of Mr. Henry and plaintiffs.

**Wherefore Plaintiffs COME NOW AND SEEK RELIEF FOR EACH CLAIM** :

385.  Plaintiff incorporates by reference paragraphs 1- 384.

386. Plaintiff Estate of Rexdale Henry, and Lonie Henry as spouse of Rexdale Henry has

permanent damages; namely, death of Rexdale Henry as a result of said incidents and as

such is entitled to recovery, including but not limited to the following:

a)  A separate award of monetary damages in the amount of one million dollars for the

estate of Rexdale Henry based on Counts I and II against the County of Neshoba and

each of the individual defendants in their official and personal capacities for the

conscious pain and suffering, increasing tremors, insomnia, anxiety attacks, confusion,

hallucinations, disorientation, increased weakness and vulnerability to attack leading to

death; loss of earnings, compensatory damages, punitive damages, attorneys fees and

costs, any and all other and further relief as this Court may deem appropriate. Plaintiff

seeks a finding that the conditions of care for those with AWS alcohol withdrawal

syndrome and delirium tremens are inadequate and violated the 14th Amendment Due

Process Clause and the Estate should receive a monetary award on Mr. Henry's behalf

to compensate for the actual violation separate from the suffering he experienced.

b) A separate award of monetary damages one million dollars each for the Estate of

Rexdale Henry against the County of Neshoba for the acts of its officials, supervisors and

employees, and against each defendant individually for the Estate of Rexdale Henry

based on Count III for his physical injuries, pain and suffering, emotional distress, loss of

earnings, compensatory damages, punitive damages, attorneys fees and costs, any and

all other and further relief as this Court may deem appropriate. Plaintiffs also seek a

separate award for the violation itself.

c) A separate award of monetary damages for the Estate of Rexdale Henry $250,000

Henry against Neshoba County based on Count IV and amount not less than $75,000

each individual defendant for the violation itself used as punishment for seeking medical

care and for  pain and suffering from those injuries, emotional distress, compensatory

damages, punitive damages, attorneys fees and costs, and any and all other and future

relief that this Court may deem appropriate.

d) A separate award of monetary damages in the amount of TWO MILLION DOLLARS

from each defendant for the Estate of Rexdale Henry against Neshoba County based on

Count V and against Sheriff Waddell, Jimmy Reid, Henry Hickman, and Evelyn McBeath

for their own acts and acts of the employees they instructed to keep Mr. Henry from

appearing in Court and remaining beyond the forty eight hour maximum for his loss of

liberty, his emotional and mental distress, punitive damages for their intentional acts,

attorneys fees and costs, and any and all other future relief that this Court may deem

appropriate.

e) A separate award of monetary damages for the Estate of Rexdale Henry and for Lonie

Henry based of TWO MILLION DOLLARS  each for each of the violations of Counts VI, VII,

VIII, IX and X against Neshoba County and for all defendants based on their official and

personal liabilities for damages for the conspiracies to deprive Mr. Henry, his spouse

and his Estate from their constitutional and civil rights pursuant to 42 U.S.C. §1983,

1985, and 1986. Damages should include amounts for pain and suffering, emotional

distress, loss of earnings, loss of familial relationship for Lonie Henry, punitive and

compensatory damages, specific damages for the deprivation of each right defendants

conspired to deprive Plaintiffs of  any and all further relief that the Court may deem

appropriate, particularly any injunctive relief aimed directly at Neshoba County and its

governing officials to comport and train its employees according to national standards

on the assessment and treatment of detainees suffering from alcohol withdrawal and

serious consequences of failing to treat with a humane approach to basic medical

assessment, care and safety of those detainees like Mr. Henry.

**TRIAL BY JURY**

WHEREFORE, Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted:

Paul D. Sullivan
Miss. Bar Number 8053
300 Linton Ave.
Natchez, Ms. 39120
601-334-9741 (t)
601-385-3994 (f)
Paul@NatchezLegal.com